GRUENINGER TRAVEL SERVICE OF FORT WAYNE, INDIANA, INC., an Indiana Corporation, d/b/a "Grueninger Travel Service," James A. Reiffert, and Susan A. Reiffert, Defendants–Appellants,

v.

LAKE COUNTY TRUST COMPANY, not individually, but as Trustee under the Trust Agreement dated December 16, 1969, and known as Trust No. 1471, by Landau and Heyman, Inc., its duly authorized agent, Plaintiff–Appellee.

No. 3–280A60.

Court of Appeals of Indiana, Fourth District.

Dec. 30, 1980.

John J. Wernet, Grotrian & Boxberger, Fort Wayne, for defendants–appellants.

David B. Keller, Lawrence E. Shine and Paul D. Mathias, Parker, Hoover, Keller & Waterman, Fort Wayne, for plaintiff–appellee.

CHIPMAN, Judge.

■ This appeal is brought from a Ten Thousand Seven Hundred Twelve Dollar and Thirty–seven Cent ($10,712.37) judgment recovered by the Lake County Trust Company (Trust Company) against Grueninger Travel Service of Fort Wayne, Indiana, Inc., an Indiana corporation, d/b/a "Grueninger Travel Service," James A. Reiffert, and Susan E. Reiffert, (hereinafter collectively referred to as Grueninger), on a complaint for breach of lease. Grueninger asserts this judgment was contrary to law because: (1) the lease terminated when Grueninger's surrender of the premises was accepted; (2) the landlord failed to mitigate damages, and (3) it was erroneous for the trial court to hold Grueninger's liability continued after a successor tenant assumed possession. Grueninger also contends there was insufficient evidence to hold it liable under the lease through March 8, 1979, and argues the damages awarded by the court were excessive and not within the scope of the evidence.[1]

We affirm.

## FACTS

Grueninger Travel Service of Fort Wayne, Indiana, Inc. leased space in 1966 to operate a travel agency in the Glenbrook

---

1. In appellee's brief, in addition to addressing the merits of Grueninger's allegations of error, the Trust Company has asked this Court to make a determination and award of reasonable attorneys' fees expended by it in defending this appeal. On the record as presented, we cannot grant this additional relief. The appellee never petitioned this court or the trial court for such an allowance and has not provided any standard to guide us in making this determination other than to suggest we invoke our "special expertise . . . in appellate practice and procedure." This is not sufficient to permit additional fees to now be awarded. *Willsey v. Hartman*, (1971) 150 Ind.App. 485, 276 N.E.2d 577.

Mall in Fort Wayne, Indiana. Although the agency was subsequently sold to James A. Reiffert in 1974, the business continued to occupy the same leased premises. Reiffert was not, however, completely satisfied with this location. He conferred with the mall's landlord, Landau and Heyman, Inc.,[2] regarding the agency's need for a larger space as well as different hours of operation, but following these discussions, Reiffert elected to continue leasing the same space. The lease now in dispute was entered into in December 1977 for a term of three years to run from January 1, 1978, until December 31, 1980, and was individually guaranteed by Reiffert and his wife, Susan.

Reiffert's discontent with the agency's location did not subside upon executing this new lease. He continued to search for suitable, larger premises. After such a location was found in June 1978, Reiffert met with Glenbrook Mall's local manager, Janet Rice, to advise her he was contemplating moving the travel agency from the mall, but he expressed no date when this possible move would occur. Reiffert was admonished by Ms. Rice in August 1978 that "Grueninger Travel Service" would be violating its lease agreement if the agency did not remain open for business until the space was re-leased. Reiffert nevertheless continued to take steps to effectuate the business' move, while at the same time remaining evasive as to when the move would occur. On the evening of September 14, 1978, the "Grueninger Travel Service" vacated its leased premises in the mall. The act of departure served as the agency's notice of when it was moving.

September 20, 1978, "Grueninger Travel Service" was notified it was in default under its lease agreement. This letter provided:

"Gentlemen:

I have been informed by the Manager of Glenbrook Shopping Center, Ms. Jan Rice, that you have ceased to operate your business, have ceased to furnish fixtures suitable for your business, and ceased to provide adequate personnel therefor, all of which is in violation of Section 8.1D of your Lease. I further understand you have posted a sign in your store window stating that you are moving.

This letter shall serve as Landlord's notice of default and if you fail to cure the defaults described in the first paragraph of this letter within ten (10) days, then Landlord will exercise any of its remedies available to it in accordance with Section 10.1 of said Lease and you will further note that you will be responsible for all attorneys' fees as provided in Section 8.1V."

Subsequent to receiving this notification, Grueninger did not take steps to cure the alleged default. This action was commenced in order to recover the indebtedness Grueninger owed at the time it vacated the leased premises as well as the additional liability which the landlord claimed Grueninger owed by virtue of Section 10.1 of the lease.

On appeal Grueninger asserts its liability should not have extended beyond: (1) September 29, 1978, when the keys were returned to the landlord; (2) October 1, 1978, when the lessor had the Collector's Gallery as a prospective tenant, yet did not take steps to deal with this business to mitigate damages, or (3) January 16, 1979, when the Collector's Gallery entered into a lease for the travel agency's vacated premises and assumed possession.

## ISSUES

### I. Alleged Surrender and Acceptance

Grueninger returned its keys to the Glenbrook office on September 29, 1978. According to Grueninger, the delivery of these keys to the landlord and its acceptance of them constituted a surrender and acceptance of the leased premises and a termination of the lease, thereby absolving Gruen-

---

**2.** Landau and Heyman, Inc. is a real estate management firm which serves as landlord for the Glenbrook Mall. The mall is actually owned by the Lake County Trust Company, as Trustee, under a Trust Agreement dated December 16, 1969, and known as Trust No. 1471.

inger of any further liability. The appellee argues no such surrender and acceptance were proven; therefore, Grueninger's liability did not cease when the keys were returned. We agree with the appellee.

◼ While Grueninger is correct in its underlying premise that when the lessor accepts a tenant's surrender of leased premises, the lessee will not be liable for rent accruing thereafter, *Paxton Realty Corp. v. Peaker*, (1937) 212 Ind. 480, 9 N.E.2d 96; *Carp & Co. v. Meyer*, (1929) 89 Ind.App. 490, 167 N.E. 151; *Weil v. Waterhouse*, (1910) 46 Ind.App. 690, 91 N.E. 746, Grueninger has erroneously equated the act of accepting the keys with the act of accepting a tendered surrender. Acceptance of the keys may be evidence of whether a surrender and acceptance have occurred, but this action alone is not sufficient to amount to an acceptance of a surrender, *Woodward v. Lindley*, (1873) 43 Ind. 333; 51C C.J.S. *Landlord and Tenant* § 125(6) (1968), particularly where, as in the case at bar, the landlord has manifested a clear intention to hold the tenant liable under its lease agreement. The legal effect of such an act depends largely upon the intent with which the keys are handed over and the purpose for which they are accepted. 49 Am.Jur.2d *Landlord and Tenant* § 1100 (1970).

◼ Whether there was a surrender and an acceptance thereof when Grueninger's keys were returned was a question of fact for the trier of fact, *Hansen v. Vessley*, (1929) 89 Ind.App. 531, 167 N.E. 153; 18 I.L.E. *Landlord and Tenant* § 155, the burden of which rested upon Grueninger to prove, *Carpenter v. Wisniewski*, (1966) 139 Ind.App. 325, 215 N.E.2d 882, since it was the party asserting this defense. 3A G. Thompson, Commentaries on the Modern Law of Real Property § 1344 (1959 Replacement Ed. by J. Grimes) [hereinafter cited as G. Thompson]; 49 Am.Jur.2d *Landlord and Tenant* § 1107 (1970); *see* Groll, *Landlord–Tenant: The Duty to Mitigate Damages*, 17 DePaul L.Rev. 311, 317 (1967–68). The trial court's judgment in favor of the appellee was in effect a finding that Grueninger did not meet its burden of proving its surrender

was accepted. Accordingly, Grueninger suffered a negative judgment, *Chicago South Shore & South Bend R.R. v. Brown*, (1974) 162 Ind.App. 493, 320 N.E.2d 809, which on appeal may only be attacked as being contrary to law. *State v. Boyle*, (1976) 168 Ind.App. 643, 344 N.E.2d 302.

◼ In determining whether a negative finding is contrary to law, this court neither weighs the evidence nor the credibility of witnesses. The judgment will be reversed only if the evidence is without conflict and leads to but one conclusion, which is the opposite of that reached by the trial court. *Alfaro v. Stauffer Chemical Co.*, (1977) Ind.App., 362 N.E.2d 500; Ind. Rules of Procedure, Trial Rule 52(A). We also note, the burden is upon the appellant to demonstrate the decision is contrary to law. Applying these principles to the case at bar, we are unable to say that finding no surrender occurred was contrary to all the evidence and therefore, contrary to law.

◼ A surrender of a tenancy is a yielding up of the tenancy to the owner of the reversion or remainder, wherein the tenancy is submerged and extinguished by agreement. Groll, *Landlord–Tenant; The Duty to Mitigate Damages, supra; see Woodward v. Lindley*, (1873) 43 Ind. 333. In Indiana, a surrender may be either express or created by operation of law. *Miller Jewelry Co. v. Dickson*, (1942) 111 Ind.App. 676, 42 N.E.2d 398; *Donahoe v. Rich*, (1891) 2 Ind.App. 540, 28 N.E. 1001. An express surrender is an agreement by the parties, *Woodward v. Lindley, supra*, which is usually required to be in writing and must be supported by consideration. *Powell v. Jones*, (1912) 50 Ind.App. 493, 98 N.E. 646. In this case, there is no evidence of an express surrender.

◼ A surrender will arise by operation of law when the parties to a lease do some act so inconsistent with the subsisting relation of landlord and tenant as to imply they have both agreed to consider the surrender as effectual. *Paxton Realty Corp. v. Peaker*, (1937) 212 Ind. 480, 9 N.E.2d 96, 100; *Carpenter v. Wisniewski*, (1966) 139

Ind.App. 325, 215 N.E.2d 882; 3A G. Thompson § 1344. Thus, a surrender cannot be effected by the actions of only one party; therefore, a surrender may not be forced upon a landlord by the unilateral actions of the tenant. To constitute a surrender by operation of law, there must be some decisive, unequivocal act by the landlord which manifests the lessor's acceptance of the surrender. *Carp & Co. v. Meyer,* (1929) 89 Ind.App. 490, 167 N.E. 151; *Aberdeen Coal & Mining Co. v. City of Evansville,* (1896) 14 Ind.App. 621, 43 N.E. 316; see G. Thompson § 1342; 52 C.J.S. *Landlord and Tenant* § 493 (1968). The resolution of whether there has been such a surrender and acceptance will be determined on a case by case basis by examining the acts of the respective parties in each case. *State v. Boyle,* (1976) 168 Ind.App. 643, 344 N.E.2d 302; *Northern Indiana Steel Supply Co. v. Chrisman,* (1965) 139 Ind.App. 27, 204 N.E.2d 668.

In the case at bar, Grueninger has attempted to attach undue importance to its delivery of the keys to the mall office by asserting that solely by the act of accepting the keys, the landlord accepted the tendered surrender. This assertion is erroneous. The keys must be returned and accepted with a view to terminate the tenancy to make this evidence of a surrender. *Woodward v. Lindley,* (1873) 43 Ind. 333. Clearly, the mere delivery of the keys to the landlord without other acts to show the landlord accepted the keys as a surrender of the premises, is not sufficient to release Grueninger from further liability.

In its appeal, Grueninger has not asserted there were any other acts or conversations evidencing an acceptance was intended when the Glenbrook office received the keys. In fact, the record supports the converse since it reveals a course of conduct by the landlord in which it repeatedly advised Grueninger of its intention to hold the agency liable under the lease. Accordingly, we hold the trial court's conclusion that Grueninger's liability was not extinguished when it returned the keys on September 29, 1978, is not contrary to law. If Grueninger were permitted to exonerate itself from its remaining liability under the lease simply by showing the landlord accepted the keys, this would effectively permit a tenant to abandon its lease at its discretion with impunity; this we will not sanction.

## II. Mitigation of Damages

By granting the relief which the lessor requested, the trial court implicitly found the landlord properly mitigated damages in its efforts to relet the abandoned premises. Grueninger attacks this finding as erroneous by arguing the landlord in fact failed to properly mitigate damages because an acceptable tenant was available on October 1, 1978, and yet the premises were not released until January 1979. In Grueninger's view, awarding any damages attributable to rent and charges after October 1, 1978, was unwarranted.

The appellee maintains that pursuant to Section 10.1 of the lease, it was under no duty to relet the premises to mitigate damages. It goes on, however, to assert that if we find it had such a duty, the evidence supports the conclusion its authorized agent satisfied this obligation by using the diligence a reasonably prudent man would have exercised under similar circumstances to relet; therefore, damages were properly mitigated. Assuming the landlord had a duty to relet the premises as espoused by this court in *Hirsch v. Merchants National Bank & Trust Company of Indiana,* (1975) 166 Ind.App. 497, 336 N.E.2d 833; see *State v. Boyle,* (1976) 168 Ind.App. 643, 344 N.E.2d 302, we find the record supports the conclusion this duty was met.

We initially note that whether the landlord exercised the requisite diligence was a question of fact to be resolved by the trier of fact. *Hirsch, supra; Carpenter v. Wisniewski,* (1966) 139 Ind.App. 325, 215 N.E.2d 882. If there had been a mandatory reletting clause, the landlord would have borne the burden of proving it used due diligence in its reletting efforts, *Carpenter, supra; Waffle v. Ireland,* (1927) 86 Ind.App. 119, 155 N.E. 513, but since there was no mandatory reletting clause in this lease agreement, the burden of proof as

to mitigation rested upon Grueninger. *Hirsch, supra.* Grueninger is, consequently, again appealing from a negative judgment; therefore, the question becomes whether Grueninger has shown this decision is contrary to law.

After looking at the evidence adduced at trial together with all reasonable inferences therefrom which tend to support the judgment, we find Grueninger has not shown the evidence is without conflict and leads only to a conclusion opposite that reached by the trial court. The matter of mitigation of damages was clearly disputed by the parties, and the record shows the evidence on this issue is conflicting. Although Grueninger may be correct in its assertion that had the landlord acted in the manner Grueninger suggests this would have mitigated damages, the focal point of our review is not whether the lessor should have conducted itself in this manner, but rather, whether the trial court could have found that in acting as it did, the landlord exercised the diligence a reasonably prudent man would have exercised under similar circumstances to relet the abandoned premises.

According to the record, Reiffert knew in the summer of 1978 he would be moving the travel agency out of the mall. In July he talked with Paul Doehrman from the Collector's Gallery regarding whether his business might be interested in the agency's space. Reiffert advised Doehrman he was in the process of moving but cautioned that he did not want anybody to know. The record shows Reiffert in fact never advised the lessor when the move would occur. By electing not to give the landlord any notice, Reiffert effectively frustrated re-leasing the premises before the travel agency moved since it would be difficult to lease a space without knowing when it would be available.

Through his actions Reiffert not only impeded an early re-leasing of the location, but he also may have prevented early discussions between the lessor and Doehrman regarding the prospect of leasing these premises. When Doehrman initially con-

tacted Janet Rice about opening a store in the mall, he never mentioned any interest in Grueninger's particular location, apparently in deference to Reiffert's desire that no one know his plans, and from the information he relayed, Ms. Rice would not have discerned Doehrmanm was interested in this space since he told her he would ideally like to have around 2000 square feet, and the travel agency's space offered only 847 square feet. Although Ms. Rice testified it is her policy to contact current mall tenants who are interested in changing locations before offering an opening to a new tenant, even if this procedure was not strictly adhered to, as Grueninger asserts, on the face of Doehrman's application, it seems reasonable that Ms. Rice would not have approached Doehrman about renting the travel agency's space. It was not until after "Grueninger Travel Service" had moved that Doehrman made his interest in Grueninger's former location known to Ms. Rice, but by this time she was engaged in discussions with another business, the Flower Pot, about leasing the space.

The Flower Pot was already a mall tenant, but its business had outgrown the confines of the kiosk or open area where it was located; consequently, the Flower Pot wanted to move from this section of the mall into an in-line location such as Grueninger's. Its lease in the kiosk area was scheduled to expire in December 1978 and was not going to be renewed since the business' spatial needs could not be met. The landlord knew it would be losing this tenant unless it found an in-line location which the Flower Pot would be interested in leasing. Not surprisingly then, when Ms. Rice became aware "Grueninger Travel Service" intended to vacate its premises, she advised the Flower Pot an in-line store might be available. After the travel agency moved, she entered into discussions with the Flower Pot about leasing these premises.

The testimony intimated it was preferable to deal with one prospective tenant at a time and permit them to reach a decision upon whether to rent a particular location

before commencing similar discussions with another prospect. Since Ms. Rice had been conferring with the Flower Pot, her actions in not immediately acting upon the news from Doehrman that he was interested in leasing the location appear reasonable, especially when the complete course of events is examined. It was not, therefore, erroneous to find Grueninger's liability did not cease on October 1, 1978, because the lessor failed to act upon the news of the Collector's Gallery's availability.

Ms. Rice's discussions with the Flower Pot continued through October. At the end of the month, she took steps to force the Flower Pot into a decision by announcing a deadline. When the business failed to respond, Ms. Rice tried to locate another travel agency or florist which would be interested in leasing this space so the same mixture of tenants in the mall would be maintained. She testified that during the ensuing month she did a lot of contacting with either of these usages in mind, but her efforts proved unsuccessful. In December, Doehrman was contacted, and a lease was eventually executed by Doehrman on January 16, 1979.

We find that after reviewing Ms. Rice's entire course of conduct in re-leasing the premises, we are unable to conclude Grueninger has shown the trial court's implicit determination that the lessor properly mitigated damages was contrary to law. The evidence is conflicting on this issue, but sufficiently supports finding Grueninger's liability did not cease October 1, 1978. We will not second guess the trial court's determination. While we no longer permit a landlord to remain quiescent and refrain from exercising any effort to relet, the standard is whether the landlord acted as a reasonable prudent man, not whether the lessor should have acted as the lessee professes.

III. Successor Tenant Assumes Possession

The record shows it was standard policy when a new tenant executed a lease at Glenbrook Mall to give them from 60 to 120 days to remodel the leased space and move in their stock. During this transition period, the tenant was not asked to pay rent. Rent commenced on the day the tenant opened its doors to the public. Pursuant to this policy, when the Collector's Gallery executed its lease January 16, 1979, it was given 60 days to complete its remodeling and settle in before it was to begin paying rent. Because its remodeling was accomplished ahead of schedule, the Collector's Gallery opened for business on March 9, 1979, a few days earlier than projected, and it began paying rent on that date. Grueninger was held liable under its lease for all the rent and other charges due through March 8, 1979.

On appeal, Grueninger argues it was erroneous to hold its liability continued after January 16, 1979. Grueninger contends an original lessee's liability for rent ceases when a second lessee enters the premises within the term of the first lease; therefore, its liability terminated when the Collector's Gallery was given possession on January 16, 1979. The appellee, however, asserts Grueninger's liability did not cease because Section 10.1 of the lease agreement expressly authorized the landlord to relet without this action effectuating a termination of Grueninger's liability. We find the trial court did not err in holding Grueninger liable through March 8, 1979, because it had indeed contracted to remain liable under these circumstances.

Historically it has been a troublesome problem for landlords as to what course of action to pursue when a tenant has abandoned the premises before the end of the lease term. If the landlord simply stood aside and suffered the premises to remain vacant the lease relation continued, but if the landlord as a man of prudence attempted to utilize the premises by reletting them, he incurred the risk of terminating the landlord-tenant relationship and with it the liability of the tenant for the rent unless he was exceedingly careful. Under the prevailing rule in most jurisdictions, a landlord is under no obligation to attempt to relet the premises following an abandonment thereof by the tenant before the expiration of the lease. 49 Am.Jur.2d *Landlord and Tenant* § 621 (1970); Groll, *Landlord–Ten-*

*ant: The Duty to Mitigate Damages, supra* at 312; Comment, *Landlord's Obligation to Mitigate When Tenant Abandons,* 1960 U.Ill.L.F.R.C. 1533.161 332; *see e. g. Patterson v. Emerick,* (1899) 21 Ind.App. 614, 52 N.E. 1012; *Aberdeen Coal & Mining Co. v. City of Evansville,* (1896) 14 Ind.App. 621, 43 N.E. 316. In fact, a landlord who does more than sit idly by and collect rent may find he has acted to his detriment. As a result, although it is undesirable to simply permit premises to lie unproductively vacant, landlords have been reluctant to take steps to relet for fear their actions would terminate the tenant's liability.

To avoid this result, lease provisions evolved expressly covering the situation where the tenant abandons the leased premises before the expiration of the term. Both parties found such provisions more advantageous than simply permitting the premises to lie vacant. The lessors preferred to relet since this meant they would no longer have to rely solely upon the continued solvency of the original tenant, and their losses would be reduced in the event of that lessee's insolvency or disappearance. *See* 2 R. Powell, The Law of Real Property ¶ 231[1] (P. Rohan ed. 1977). The tenant preferred to have the premises relet since its losses would also be reduced or obviated by such an action. Accordingly, the parties began expressly contracting to permit a landlord to relet the premises in the event of a forfeiture or abandonment by the tenant.

 It is now clear a lessor and lessee may expressly agree that a re–entry and reletting shall not constitute a surrender. 3A G. Thompson § 1345; McCormick, *The Rights of the Landlord upon Abandonment of the Premises by the Tenant,* 23 Mich.L. Rev. 211 (1925). Since a lease, like other contracts, should be reasonably interpreted to effectuate the intention of the parties, when a lease expressly permits the landlord to relet, there is no reason why it should not be enforced, thereby recognizing the integrity of the landlord and the tenant to contract, Comment, *Landlord's Obligation to Mitigate When Tenant Abandons, supra* ;

consequently, these provisions have been uniformly upheld by the courts. 3A G. Thompson § 1343; Krieger & Shurn, *Landlord–Tenant Law: Indiana at the Crossroads,* 10 Ind.L.Rev. 591, 639 (1977).

> "There is nothing illegal or improper in an agreement that the obligation of the tenant to pay all the rent to the end of the term shall remain, notwithstanding there has been a re–entry for default; and, if the parties choose to make such an agreement, we see no reason why it should not be held to be valid as against both the tenant and his sureties."

*Grommes v. St. Paul Trust Co.,* (1893) 147 Ill. 634, 35 N.E. 820, 822; *accord Yates v. Reid,* (1950) 36 Cal.2d 383, 224 P.2d 8; *Ruston v. Centennial Real Estate & Investment Co.,* (1968) 166 Colo. 377, 445 P.2d 64; *see also Waffle v. Ireland,* (1927) 86 Ind. App. 119, 155 N.E. 513. As long as the landlord does no more than exercise the rights accorded to it under the lease, the lessor's conduct will not result in a surrender of the lease by operation of law.

In the case at bar, Section 10.1 of the lease expressly provided in part:

> "Upon the happening of any one or more of the above–mentioned events Landlord may repossess the Leased Premises . . ., without demand or notice of any kind to Tenant . . . and without terminating this Lease, in which event Landlord may, but shall be under no obligation so to do, relet all or any part of the Leased Premises for such rent and upon such terms as shall be satisfactory to Landlord (including the right to relet the Leased Premises for a term greater or lesser than that remaining under the Lease Term, and the right to relet the Leased Premises as a part of a larger area, and the right to change the character or use made of the Leased Premises). For the purpose of such reletting, Landlord may decorate and make any repairs, changes, alterations or additions in or to the Leased Premises that may be necessary or convenient. . . . If the Leased Premises are relet and a sufficient sum shall not be realized from such reletting

after paying all of the expenses of such decorations, repairs, changes, alterations, additions, the expenses of such reletting and the collection of the rent accruing therefrom, to satisfy the rent herein provided to be paid for the remainder of the Lease Term, Tenant shall pay to Landlord on demand any deficiency and Tenant agrees that Landlord may file suit from time to time to recover any sums falling due under the terms of this Section."

In view of the above provision, it is clear the re–entry by the lessor and its subsequent re–leasing to the Collector's Gallery, should not constitute an acceptance by the landlord.

This court has previously held that when such a savings clause appears in a lease and the landlord endeavors to relet the premises, these reletting efforts will not constitute a surrender by operation of law, *Hirsch v. Merchants National Bank & Trust Company of Indiana,* (1975) 166 Ind.App. 497, 336 N.E.2d 833; *Carpenter v. Wisniewski,* (1966) 139 Ind.App. 325, 215 N.E.2d 882, since it would be inconsistent to ask landlords to act diligently to mitigate damages and then, in effect, penalize them for so acting by finding their steps toward mitigating evidenced an acceptance. Today we decline to limit the permissible bounds within which the landlord can act to only efforts to relet. If the lease expressly provides, as the agreement herein did, that the landlord may relet without terminating the original lessee's liability, then we see no reason to hold a surrender and acceptance have been effectuated as a matter of law simply because the landlord relets the premises. *See* Groll, *Landlord–Tenant: The Duty to Mitigate Damages, supra* at 316; Krieger & Shurn, *Landlord–Tenant Law: Indiana at the Crossroads, supra* at 638; *cf. Waffle v. Ireland, supra.* Before we will imply an acceptance by the landlord, the landlord's actions must be equivalent to an agreement to accept the proffered surrender. *Carp & Co. v. Meyer,* (1929) 89 Ind.App. 490, 167 N.E. 151. Where as here, the landlord acts pursuant to the lease agreement, its actions are consistent with the subsisting landlord–

tenant relationship and therefore will not discharge the original tenant.

■ We are not, however, intimating that if there is a provision in the lease sanctioning reletting, the act of reletting can never effect a surrender. As in other situations where a surrender is averred, the facts surrounding each reletting must be examined case by case to determine whether there has been a surrender. *Northern Indiana Steel Supply Co. v. Chrisman,* (1965) 139 Ind.App. 27, 204 N.E.2d 668. Clearly in reletting the landlord is not at liberty to do any more than exercise the rights accorded it in the lease; therefore if the reletting occurs in conjunction with other circumstances which are inconsistent with the continuance of the relationship of landlord and tenant, this will work a surrender and acceptance. So it has been held, for example, that if the terms of the original lease do not permit a landlord to relet for a period longer than the unexpired term, and the landlord does so, this action indicates the landlord was acting on its own account, inconsistent with the lease relation and therefore, may work a surrender. *Yates v. Reid,* (1950) 36 C.2d 383, 224 P.2d 8, 10 (dissenting opinion); 49 Am.Jur.2d *Landlord and Tenant* § 1108 (1970); 52 C.J.S. *Landlord and Tenant* § 498b(1) (1968). In this case, the term of the Collector's Gallery's lease extended beyond the time remaining in Grueninger's lease, but such an extension was expressly provided for.

■ Similarly, alteration of the leased premises may cast light upon the intention of the landlord. 49 Am.Jur.2d *Landlord and Tenant* § 1109 (1970). If the landlord materially alters the leased premises without the lessee's consent, the lessor may be deemed to have accepted a surrender, *Northern Indiana Steel Supply Co., supra; Paxton Realty Corp. v. Peaker,* (1937) 212 Ind. 480, 9 N.E.2d 96, but the extent to which the Collector's Gallery was permitted to remodel does not appear to have stepped beyond the remodeling anticipated in Section 10.1.

██ Thus, we hold that while a landlord may relet vacated premises without this action effectuating an acceptance if the lease authorizes reletting, the landlord is not given carte blanche in this matter. The lessor's conduct as well as the terms of the subsequent lease, must be consistent with the provisions in the lease authorizing the reletting. Since the landlord's actions were compatible with these provisions, Grueninger remained liable pursuant to Section 10.1 of its lease agreement.

██ Although Grueninger argues it should not be liable for losses incurred by the landlord after a successor tenant assumed possession, its argument completely ignores the language found in Section 10.1. Under this provision of the lease, Grueninger expressly covenanted that upon default, it would be liable for any deficiency between the amount the landlord would have received had Grueninger remained in possession and the amount received from reletting, not merely the deficiency due when the subsequent tenant took possession. *See Northern Indiana Steel Supply, Co., supra.* Thus, under this section, if the successor tenant's rent had been less than the rent Grueninger was obligated to pay, but the landlord showed it had exercised due diligence in reletting at this rental, Grueninger would be liable for the difference between the amount of rent realized from reletting and the amount the lessor would have received had Grueninger not abandoned the premises, i. e., Grueninger would be liable for a deficiency incurred after the successor tenant assumed possession. *See Waffle v. Ireland, supra.* To conclude Grueninger was only liable for the deficiency due before a successor tenant assumed possession would thwart the express language of Section 10.1. This provision permitted the lessor to hold Grueninger liable for the differ-

ence between the reserved rent and the rent received from reletting.[3] *See Grommes v. St. Paul Trust Co., supra;* Krieger & Shurn, *Landlord–Tenant Law: Indiana at the Crossroads, supra* at 639; McCormick, *The Rights of the Landlord upon Abandonment of the Premises by the Tenant, supra* at 218.

██ We note, additionally that the fact the Collector's Gallery was permitted to occupy the premises rent free from January 16, 1979, through March 8, 1979, for purposes of remodeling, does not mean the lessor could not recover the rent owed during this time period from Grueninger, provided the landlord was justified in taking this action. 52 C.J.S. *Landlord and Tenant* § 498b(2) (1968). Our court has previously recognized an original tenant may be liable for a deficiency in rent if the landlord in reletting exercised due diligence to relieve the lessee of such liability as it could. *Waffle v. Ireland, supra.* Since we find the evidence herein supports the trial court's implicit conclusion that the lessor exercised due diligence in giving the Collector's Gallery free rent for this brief transition period, the landlord could recover the losses it incurred during this time from Grueninger.

From the foregoing, it should be apparent our conclusion it was not contrary to law to hold Grueninger liable through March 8, 1979, is premised upon the fact we agree with the appellee that Grueninger expressly contracted under Section 10.1 to be liable in this manner. We find that on appeal, however, Grueninger ignores its lease covenant and posits that as a matter of law, when a successor tenant assumes possession within the term of the first lease, the original lessee's liability for rent ceases. While this might be the result in the absence of Section 10.1 or a similar provision in the lease,

---

**3.** Although the lessor only sought to recover for charges due through March 8, 1979, we are not implying Grueninger's liability ceased on that date. The trial court never found a surrender and acceptance; therefore, the covenants of the lease remained operative, including Grueninger's covenant to pay any deficiency. It appears Grueninger could potentially incur liability even after March 8, 1979, if the land-

lord acts diligently and yet fails to recover the amount of rent due under Grueninger's lease through the remainder of the term. Recovering the rent deficiency owed through March 8, 1979, does not foreclose the possibility the landlord could later bring an action to recover any deficiency accruing after March 8, 1979. *Cf. Booher v. Richmond Square Inc.*, (1974) 160 Ind.App. 44, 310 N.E.2d 89.

the parties are free to agree that such a reletting shall not constitute a surrender, 3A G. Thompson § 1345; Krieger & Shurn, *Landlord–Tenant Law: Indiana at the Crossroads, supra* at 638, and they did so in this case.

In support of Grueninger's premise that its liability ceased when the Collector's Gallery entered into a lease for the vacated premises and took possession, Grueninger relies upon *Carp & Co. v. Meyer*, (1929) 89 Ind.App. 490, 167 N.E. 151, *Northern Indiana Steel Supply Co. v. Chrisman*, (1965) 139 Ind.App. 27, 204 N.E.2d 668, and *Hirsch v. Merchants National Bank & Trust Company of Indiana*, (1975) 166 Ind.App. 497, 336 N.E.2d 883. We find these cases do not conclusively affirm Grueninger's position.

Although the court in *Carp* held the original tenant was liable to the time a second tenant took possession, our review discloses the court's decision did not foreclose the possibility the tenant's liability could extend beyond this time. The court never directly addressed the question of whether the lessee's liability could continue after the successor tenant took possession, apparently because there is no indication the landlord was seeking damages beyond the time when the subsequent tenant assumed possession. The crucial issue in *Carp* was not whether the original tenant's liability ceased when a successor tenant took possession, but rather, whether the lessor's actions in leasing the premises to another tenant showed an acceptance of the lessee's attempted surrender as a matter of law. We find the court must have concluded it did not evidence such an acceptance since the facts in *Carp* showed the lease to the successor tenant was dated July 20, 1926, and yet the court concluded the original tenant was liable until September 1, 1926; therefore, we are unable to agree with *Northern* wherein the court inferred the *Carp* court concluded the lessor had accepted the surrender when the lessor re–leased the property to another.

*Hirsch* lends no support to Grueninger's proposition that subsequent possession by a successor tenant will work an acceptance since in *Hirsch*, the "successor tenant" was the landlord itself. If a lessee abandons the leased estate and the lessor resumes possession, this conduct is generally held to have worked a surrender by operation of law because possession by the lessor for its own purpose is inconsistent with the continuance of the lease, unless the lease contains a provision preserving the lessee's liability for future rent under such circumstances. W. Burby, Handbook of Law of Real Property 187 (3d ed. 1965); 3A G. Thompson § 1345; 49 Am.Jur.2d *Landlord and Tenant* § 620 (1970); *see* C. Donahue, T. Kauper & P. Martin, Cases and Materials on Property 797 (1974). This does not support the premise, however, that possession by a successor tenant other than the landlord, as in the case at bar, would result in an acceptance and surrender by operation of law.

We conclude that under the provisions of this lease, it was not contrary to law for the trial court to find Grueninger's liability did not terminate when the landlord re–leased the premises, and the successor tenant assumed possession. *See Waffle v. Ireland, supra.* The evidence was sufficient to support the trial court's implicit conclusion that the lessor exercised due diligence in its re-letting efforts and was, therefore, entitled to recover losses incurred through March 8, 1979, from Grueninger.

### IV. Insufficient Evidence

In addition to arguing the judgment was contrary to law, Grueninger also contends the evidence was insufficient to support finding its liability continued beyond either October 1, 1978, or January 16, 1979. In view of the fact Grueninger suffered a negative judgment, since it had the burden of proof on both mitigation of damages, *Hirsch, supra,* and surrender and acceptance, *Carpenter v. Wisniewski*, (1966) 139 Ind.App. 325, 215 N.E.2d 882, this attack questioning the sufficiency of the evidence to support the judgment raises no issue for review. *Alfaro v. Stauffer Chemical Co.*, (1977) Ind.App., 362 N.E.2d 500. A negative decision is subject to attack only as being contrary to law. *Blankenship v. Huesman*, (1977) Ind.App., 362 N.E.2d 850.

## V. Excessive Damages

In its final assertion of error, Grueninger alleges the damages awarded were excessive and not within the scope of the evidence. We disagree.

In order to justify a reversal on the question of excessive damages, the amount of damages assessed must appear so outrageous as to impress the court at first blush with its enormity. *Indianapolis Transit, Inc. v. Moorman,* (1963) 134 Ind.App. 572, 189 N.E.2d 111. Our review discloses Grueninger premises its position that excessive damages were awarded upon the same claims it made earlier when arguing it was erroneous to hold it liable beyond either October 1, 1978, or January 16, 1979. We have already rejected these arguments. Since Grueninger makes no assertion that if it were liable through March 8, 1979, any of the damages the trial court awarded were erroneous, we find no error in the amount of damages awarded.

Judgment affirmed.

YOUNG, P. J., and MILLER, J., concur.