Robert EPPL, Appellant,

v.

Christine DiGIACOMO, Appellee.

No. 45A03–1007–SC–402.

Court of Appeals of Indiana.

May 4, 2011.

Ray L. Szarmach, Merrillville, IN, Attorney for Appellant.

Kevin E. Werner, Crown Point, IN, Attorney for Appellee.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

Robert Eppl appeals from the small claims court's judgment in favor of Christine DiGiacomo ordering Eppl to return DiGiacomo's security deposit.

We affirm in part, reverse in part, and remand with instructions.

### ISSUE

Whether the small claims court's judgment granting DiGiacomo's claim for the return of her security deposit is contrary to law.

### FACTS

On December 12, 2007, DiGiacomo signed a one-year written lease agreement, which was due to terminate December 31, 2008, with Eppl for a unit in the Cedar Point Apartments complex in Crown Point, Indiana. The lease was secured by a $550.00 security deposit. The lease agreement provided, in part, that "[p]art or all of the Security Deposit may be withheld ... to reimburse [Eppl] for damages including, but not limited to, the following: ... (b) A charge for nail holes, and a charge for painting or carpet cleaning beyond normal wear and tear; (c) Charges for any other damages to the Leased Premises[;] ... (e) Any charges due under this Lease, including rent[.]" (App.16).

"[I]n November [or] early December" of 2008, DiGiacomo asked Eppl "if [she] could stay just for a couple more months because the place that [she] was moving into wasn't ready. He agreed." (Tr. 11). Thus, DiGiacomo and Eppl proceeded under an extended month-to-month tenancy, which commenced on January 1, 2009, after the expiration of the written lease.

In early January 2009, DiGiacomo paid rent in full for the month of January. In early February, after having paid February's rent in full, DiGiacomo telephoned Eppl and informed him of her intention to vacate the premises on February 13. She also asked him where she should return the keys. Eppl instructed her to return the keys to the rental office. There was no discussion between the parties about proration of the rent or the effect, if any, of DiGiacomo's leaving the premises before the end of the month.

On February 13, 2009, DiGiacomo moved out, dropped off the keys as agreed, and provided a forwarding address. "Approximately sometime the first week" of March 2009, Eppl returned from vacation and inspected the apartment. (Tr. 59). On April 10, 2009, DiGiacomo received an itemized list of alleged damages from Eppl,[1] indicating that she had forfeited her security deposit and owed a balance of $87.50[2] for additional damages, including excessive nail holes, a broken light fixture, and the cost of repainting the apartment with two coats of paint.

On February 10, 2010, DiGiacomo filed her complaint, seeking a refund of her security deposit and attorney's fees. Eppl filed his answer—indicating that DiGiacomo had forfeited her security deposit due to damages—and a counterclaim for $87.50. The small claims court held a bench trial on July 19, 2010, and issued an order providing, in part, as follows:

> The primary dispute here turns on the determination of when the lease terminated within the meaning of the Security Deposit Statutes. It [sic] the lease terminated on February 13, 2009, [Eppl]'s itemization is untimely and he can claim

no damages. If the lease terminated on February 28, 2009, the itemization was timely and [Eppl] can then attempt to pursue damages.

> [Eppl] points to the case of *Mileusnich v. Novogroder,* 643 N.E.2d 937 (Ind.Ct.App.1994) for the proposition that [DiGiacomo]'s mere tender of the keys was insufficient to establish surrender and acceptance, and thus, termination of the lease on February 13, 2009. While [Eppl] correctly states the proposition of law here, [his] argument overlooks the specific facts of this case. This was not an instance where a Tenant sought to abandon a lease without [a] Landlord's consent. Quite the contrary, given the facts as found above, the court is satisfied that the parties in fact expressly agreed to termination of the lease on February 13. As such, the 45–day clock began to run on that date. This results in the itemization being untimely. As a matter of law, [Eppl] cannot claim any damages. See I.C. § 32–31–3–15.

> Alternatively, the court finds that [Eppl]'s claim regarding the number of nail holes for which [DiGiacomo] was liable (53) was not correct. Rather, there were no more than eight nail holes in the walls. As such, the itemization made an inappropriate deduction in this regard. Moreover, this also calls into question the legality of [Eppl]'s attempt to charge [DiGiacomo] with painting the premises. At least in these two respects the itemization is deficient. As a defective itemization is viewed as the equivalent of providing no itemization at all, again [Eppl] can claim no damages. *See*

---

1. George Eppl, Eppl's brother and business partner, actually mailed the itemization.

2. This figure reflects the balance after DiGiacomo's $550.00 security deposit was deducted from Eppl's alleged damages in the amount of $637.50.

*Pinnacle Properties v. Saulka,* 693 N.E.2d 101 (Ind.Ct.App.1998).

\*　　\*　　\*

\*　　\*　　\*

JUDGMENT ON MS. DIGIACOMO'S CLAIM: FOR MS. DIGIACOMO AND AGAINST MR. EPPL IN THE AMOUNT OF $1390.00 plus court costs, including any sheriff's service fee, and post-judgment interest at the statutory rate.

JUDGMENT ON MR. EPPL'S COUNTERCLAIM: FOR MS. DIGIACOMO AND AGAINST MR. EPPL; MR. EPPL TO TAKE NOTHING BY WAY OF HIS CLAIM.

(Order 1–2). Eppl now appeals.

## DECISION

■■■ Eppl argues that the small claims court erred in granting judgment for DiGiacomo and ordering him to return her security deposit and to pay her attorney fees. We agree.

"Our standard of review is particularly deferential in small claims actions, 'where the trial shall be informal, with the sole objective of dispensing speedy justice between the parties according to the rules of substantive law.'" The parties in a small claims court action bear the same burdens of proof as they would in a regular civil action on the same issues.

*Mayflower Transit, Inc. v. Davenport,* 714 N.E.2d 794, 797 (Ind.Ct.App.1999) (quoting Ind. Small Claims Rule 8(A)) (internal citations omitted). It is incumbent upon the party who bears the burden of proof to demonstrate that it is entitled to the recovery sought. Because Eppl bore the burden of proof on his counterclaim before the small claims court, he appeals from a negative judgment. *Id.* We will not reverse a negative judgment unless it is contrary to

law. *Id.* A judgment is contrary to law when the evidence is without conflict and leads to but one conclusion, but the trial court reached a different conclusion. *Id.*

### 1. *Surrender and Acceptance*

■■■ At issue is whether the small claims court properly interpreted and applied the Indiana's Security Deposits Statute ("the Statute"), Indiana Code chapter 32–31–3 *et seq.,* determining when the parties' lease terminated. Questions of statutory interpretation are questions of law that are reviewed *de novo* on appeal. *Mayberry Café, Inc. v. Glenmark Const. Co., Inc.,* 879 N.E.2d 1162, 1170 (Ind.Ct. App.2008).

The Statute governs landlords' duties to return security deposits to tenants. *Figg v. Bryan Rental Inc.,* 646 N.E.2d 69, 71 (Ind.Ct.App.1995). The key provisions follow:

[I.C. § 32–31–3–12] (a) Upon termination of a rental agreement, a landlord shall return to the tenant the security deposit minus any amount applied to:

(1) the payment of accrued rent;

(2) the amount of damages that the landlord has suffered or will reasonably suffer by reason of the tenant's noncompliance with law or the rental agreement; and

(3) unpaid utility or sewer charges that the tenant is obligated to pay under the rental agreement;

all as itemized by the landlord with the amount due in a written notice that is delivered to the tenant not more than forty-five (45) days after termination of the rental agreement and delivery of possession. The landlord is not liable under this chapter until the tenant supplies the landlord in writing with a mailing address to which to deliver the notice and amount prescribed by this subsection. Unless otherwise agreed, a

tenant is not entitled to apply a security deposit to rent.

(b) If a landlord fails to comply with subsection (a), a tenant may recover all of the security deposit due the tenant and reasonable attorney's fees.

(c) This section does not preclude the landlord or tenant from recovering other damages to which either is entitled.

(d) The owner of the dwelling unit at the time of the termination of the rental agreement is bound by this section.

[I.C. § 32–31–3–13] A security deposit may be used only for the following purposes:

(1) To reimburse the landlord for actual damages to the rental unit or any ancillary facility that are not the result of ordinary wear and tear.

(2) To pay the landlord for:

(A) all rent in arrearage under the rental agreement; and

(B) rent due for premature termination of the rental agreement by the tenant.

(3) To pay for the last payment period of a residential rental agreement if a written agreement between the landlord and the tenant stipulates that the security deposit will serve as the last payment of rent due.

(4) To reimburse the landlord for utility or sewer charges paid by the landlord that are:

(A) the obligation of the tenant under the rental agreement; and

(B) unpaid by the tenant.

[I.C. § 32–31–3–14] Not more than forty-five (45) days after the termination of occupancy, a landlord shall mail to a tenant an itemized list of damages claimed for which the security deposit may be used under section 13 of this chapter. The list must set forth:

(1) the estimated cost of repair for each damaged item; and

(2) the amounts and lease on which the landlord intends to assess the tenant. The landlord shall include with the list a check or money order for the difference between the damages claimed and the amount of the security deposit held by the landlord.

[I.C. § 32–31–3–15] Failure by a landlord to provide notice of damages under section 14 of this chapter constitutes agreement by the landlord that no damages are due, and the landlord must remit to the tenant immediately the full security deposit.

[I.C. § 32–31–3–16] A landlord who fails to comply with sections 14 and 15 of this chapter is liable to the tenant in an amount equal to the part of the deposit withheld by the landlord plus reasonable attorney's fees and court costs.

I.C. §§ 32–31–3–12,–13,–14,–15,–16.

■■ The primary aim of the Statute is to provide for the timely return of the tenant's security deposit and to protect the tenant from wrongful withholding of the deposit by the landlord. *Lae v. House-holder,* 789 N.E.2d 481, 485 (Ind.2003). The notice requirements are meant to apprise the tenant of the specific damages or liability claims that the landlord is attempting to offset against the security deposit. *Id.* "In a nutshell, the [S]tatute provides that the landlord must refund the deposit, net of damage claims, within forty-five days and supply an itemized list of any damages claimed to reduce the amount to be refunded." *Id.* "Failure to refund and supply the itemized list results in a waiver of any claim for damages and exposes the landlord to liability for the tenant's attorney fees." *Id.*

■ "[I]t is the termination of the lease agreement which triggers the 45–day notice provision." *Figg,* 646 N.E.2d at 73. "Termination of a lease agreement occurs

when the tenant surrenders the tenancy and the landlord accepts the tenant's surrender." *Floyd v. Rolling Ridge Apartments,* 768 N.E.2d 951, 955 (Ind.Ct.App. 2002) (citing *Rueth v. Quinn,* 659 N.E.2d 684, 688 (Ind.Ct.App.1996)).

■■■ "A surrender of tenancy is a yielding of the tenancy to the owner of the reversion or remainder, wherein the tenancy is submerged and extinguished by the agreement." *Mileusnich v. Novogroder Co., Inc.,* 643 N.E.2d 937, 939 (Ind.Ct.App. 1994) (citing *Grueninger Travel Service of Ft. Wayne, Indiana, Inc. v. Lake County Trust Co.,* 413 N.E.2d 1034, 1038 (Ind.Ct. App.1980)). "Surrender may be express or by operation of law." *Id.* Surrender arises by operation of law when the parties to a lease "take an action that is so inconsistent with the subsisting landlord-tenant relationship as to imply they have both agreed to deem the surrender to have taken effect." *Id.*

Here, Eppl asserts that "there was no legal surrender and acceptance [when DiGiacomo vacated the premises] on February 13, 2009." Eppl's Br. at 10–11. He asserts further that the 45–day clock began to run after February 28, 2009, the last day of DiGiacomo's leasehold period.

In support of his claim, Eppl relies upon *Grueninger* and *Floyd.* In *Grueninger,* we rejected the tenant's claim that its delivery of the keys to the landlord and the landlord's acceptance thereof constituted acceptance of surrender and termination of the lease. We held that "the mere delivery of the keys to the landlord *without other acts* to show the landlord accepted the keys as a surrender of the premises, [wa]s not sufficient to release [the tenant] from [ ] liability." 413 N.E.2d at 1039 (emphasis added).

In *Floyd,* tenant Floyd signed an original one-year lease and paid a security deposit. She subsequently signed a one-year renewal lease; however, she vacated the premises mere days before the close of the renewal lease period. Within approximately a month of her departure, the landlord sent her an itemization of damages. Floyd filed suit, alleging, *inter alia,* that the itemization was untimely because the landlord had not delivered it at the end of the original lease period. The trial court inferred from the parties' conduct that no itemization of damages was required at the end of the original lease term and concluded that the lease had terminated (and the 45–day clock had commenced to run) at the end of the renewal lease term.

In affirming the trial court, we found that Floyd's actions were inconsistent with surrender of the tenancy, namely, that: (1) she did not vacate the premises at the end of the original lease term, choosing rather to inhabit the premises through much of the renewal lease term; (2) she had not provided the landlord with notice of her intent to either "discontinue occupancy or terminate her obligations under the rental agreement" before her departure; and (3) she continued to pay rent after the original lease term ended and throughout the renewal lease term. *Id.* at 957. Thus, we concluded that "Floyd's actions indicate[d] that she did not intend the rental agreement to terminate until [the end of the renewal lease term]"; and that the landlord's provision of the itemization of charges against the security deposit within forty-five days of the close of the renewal lease term comported with the Statute. *Id.* at 955–56.

In *Figg,* tenant Figg entered into a written one-year lease agreement. Approximately five months before the end of his lease term, Figg's attorney returned the keys and informed the landlord that Figg had vacated the apartment. The landlord demanded that Figg continue to pay rent

until the end of the lease term or until a new subtenant was found. In response, Figg paid a month's rent to cover the final month of his leasehold term. Subsequently, his attorney demanded that the landlord return Figg's security deposit and refund the rental payments for the period between the time that he vacated the premises and the end of the lease term. The landlord responded that Figg's security deposit had been applied to the outstanding lease obligation through the end of the lease term. Thereafter, the landlord sent an itemized list of damages to Figg. The landlord sued Figg and was granted summary judgment.

In affirming the trial court, we found that the landlord's conversation with Figg, wherein the landlord demanded that Figg continue the lease agreement "was not a decisive, unequivocal act ... which manifest[ed] [his] acceptance of Figg's surrender." *Id.* at 74. We concluded that Figg had surrendered the premises when he stopped paying rent in accordance with the lease agreement, and that the landlord accepted Figg's surrender when it sent the itemization of damages to Figg.

 Here, as in *Floyd*, DiGiacomo's conduct does not indicate that she intended the rental agreement to terminate until the end of February. The record reveals that she paid rent through the end of February and she never requested, nor did the parties discuss, a pro rata refund of monies paid for the period between her vacation of the premises on February 13, 2009 and the end of the month.

Moreover, it is undisputed that in late November or early December, DiGiacomo requested, and Eppl agreed, to a holdover month-to-month tenancy so that DiGiacomo could "stay just for a couple more months." (Tr. 11). Pursuant to this oral contract, DiGiacomo was bound, commencing on January 1, 2009, to adhere to the agreed rental terms for two additional months. Her telephone call to Eppl that she was vacating the premises on February 13, 2009, predated the close of the extended leasehold term; and, further, did not constitute the typical notice of the termination of a month-to-month leasehold. *See* I.C. § 32–31–1–4 (a month-to-month tenancy may be terminated by giving a one-month notice).

Further still, DiGiacomo cannot demonstrate that Eppl took any decisive, unequivocal action on February 13, 2009, that manifested his acceptance of her surrender of the premises. Without more, DiGiacomo's mere delivery of the keys is not sufficient to demonstrate that Eppl actually accepted the surrender of the premises, and thereby, released DiGiacomo from liability as of that date. *See Hirsch v. Merchants Nat. Bank & Trust Co. of Indiana,* 166 Ind.App. 497, 336 N.E.2d 833, 839 (1975) ("[m]ere yielding of the premises by the tenant to the landlord does not constitute surrender or acceptance."); *see also Grueninger,* 413 N.E.2d at 1039 ("the mere delivery of the keys to the landlord without other acts to show the landlord accepted the keys as a surrender of the premises, [wa]s not sufficient to release [tenant] from [ ] liability.").

Rather, as in *Figg*, Eppl's only decisive, unequivocal action that manifested his acceptance of DiGiacomo's surrender occurred on April 10, 2009, when DiGiacomo received his itemization of damages letter, which did not contain a demand for March's rent payment. We therefore conclude that the oral lease agreement herein terminated as of February 28, 2009, and Eppl's 45–day period began on said date. *See Floyd,* 768 N.E.2d at 955 ("termination of a lease agreement occurs when the tenant surrenders the tenancy and the landlord accepts the tenant's surrender."); *see also Figg,* 646 N.E.2d at 73 ("it is the

termination of the lease agreement which triggers the 45 day notice provision").

Based upon the foregoing, we conclude that Eppl's itemization of damages letter was timely because it was sent within forty-five days of the termination of the lease agreement. Thus, we find that "the evidence is without conflict and leads to but one conclusion which is opposite from that reached by the [small claims court]." *Mayflower*, 714 N.E.2d at 797. Accordingly, we conclude that the small claims court erred in concluding that Eppl cannot claim damages because of "the itemization being untimely," (*see* Order 2); and its judgment that DiGiacomo was entitled to the return of her security deposit is contrary to law. We therefore reverse and remand to the trial court with instructions to vacate its judgment, including attorney's fees, in favor of DiGiacomo and to enter judgment in favor of Eppl.

### 2. *Itemization of Damages*

Next, Eppl challenges the small claims court's finding that his itemization of damages was "deficient" and "defective," and that he was therefore not entitled to damages. (Order 2).

Small claims judgments are "subject to review as prescribed by relevant Indiana rules and statutes." Ind. Small Claims Rule (A). As noted above, our "particularly deferential" standard of review provides that we will not disturb the judgment of a small claims court unless it is contrary to law, meaning that the evidence is without conflict and leads to but one conclusion which is opposite from that reached by the [small claims] court. *Mayflower*, 714 N.E.2d at 797. Indiana Trial Rule 52(A) provides that "[o]n appeal of claims tried by the court without a jury," the reviewing court shall give "due regard ... to the opportunity of the trial court to judge the credibility of the witnesses."

The parties' written lease states that "[p]art or all of the Security Deposit may be withheld ... to reimburse [Eppl] for damages including, but not limited to, the following: ... (b) A charge for nail holes, and a charge for painting or carpet cleaning beyond normal wear and tear." (App.12).

Eppl's April 10, 2009 itemization of damages provides as follows:

> Per our rental agreement I am notifying you of the charges that have been incurred in repairing the apartment F–142, that you vacated on February 28,[3] 2009. * * * Fill 53 nail holes in walls throughout Apartment. Per agreement $2.50 per hole. 53 × $2.50 = 132.50. See attached[.]

(App.11).

The record reveals that the parties gave conflicting evidence regarding the number of nail holes in the apartment walls and whether the apartment needed to be repainted. Under direct examination, DiGiacomo testified as follows:

Q: Can you explain to the Court ... exactly the size of this apartment?

A: It was a small one bedroom, one bathroom apartment that was approximately around six hundred and fifty square feet.

Q: Okay. Did you have fifty-three nail holes in the—

A: Absolutely not.

Q: Okay. You did have some nail holes, correct?

A: Yes.

Q: Okay.

---

**3.** At trial, Eppl did not dispute that DiGiacomo vacated the premises on February 13, 2009. (*See* Tr. 58–59).

A: I did.

\* \* \*

Q: In the six hundred square feet, how many holes—how many—and the only nail holes were for thing that you hung, correct?

A: Yes.

Q: And how many nail holes were there?

A: I hung eight to ten pictures total.

(Tr. 23–24). DiGiacomo also testified that the parties' lease agreement provided that "If, if the apartment had beyond normal wear and tear, . . . and they would have to repaint [it] with two coats then [Eppl] would charge me." (Tr. 25). She testified that the unit did not require painting when she left." (Tr. 25). On the other hand, Eppl testified as follows under cross-examination:

Q: When you inspected the apartment, what condition was it in?

A: It was clean; other than the nail holes and the broken light fixture. . . .

Q: Okay. In the damage letter [it] states fifty-three holes. Did you count them?

A: Yes, I did.

Q: Okay. Individually?

A: Individually. I, yes, I do believe so.

Q: Okay. And that's how you got fifty-three?

A: And I had another person there with me. We counted them several times to make sure that there was [sic] fifty-three holes.

(Tr. 60). Eppl testified further that he "d[id]n't remember" if he took any pictures of the nail hole damage or the condition of the apartment walls. (Tr. 64). He admitted that he had no such evidence to present to court at trial.

■ Eppl bore the burden of proof below regarding his claim for damages, which the small claims court concluded he failed to carry. Given the conflicting testimony that was presented at trial, we cannot say that the small claims court erred in finding that Eppl's itemization "made an inappropriate deduction" regarding the nails holes, which "call[ed] into question the legality of [his] attempt to charge [DiGiacomo for] painting the premises." (Order 2).

In deference to the small claims court's discretion in resolving conflicts of testimony and determining the weight of the evidence and the credibility of the witnesses, we cannot say that evidence as to the appropriateness of Eppl's deductions for nail holes and the cost of repainting is without conflict and leads to a conclusion which is opposite from that reached by the small claims court. *See Mayflower*, 714 N.E.2d at 797; *see also* Indiana Trial Rule 52(A).

Thus, we affirm the small claims court's determination that Eppl is not entitled to prevail in whole on his counterclaim for damages; notably, however, because DiGiacomo testified that she was responsible for some of the nail hole damage as well as the broken light fixture, we remand to the trial court with instructions to calculate the undisputed nail hole damages and expenses for repair of the broken light fixture to be deducted from the security deposit. Each party to bear his or her own attorney's fees pursuant to the American Rule.

Affirmed in part, reversed in part, and remanded with instructions.

NAJAM, J., and BAILEY, J., concur.