INTERNATIONAL CREATIVE MANAGEMENT, INC., Perri A. Reid d/b/a "Pebbles," Reidstein, Inc., and P.T. Entertainment, Appellants–Defendants,

v.

D & R ENTERTAINMENT CO., INC., C. Ray Donaldson and Willie C. Rhodes d/b/a D & R Productions, and Reginald Atkins, Appellees–Plaintiffs.

No. 49A02–9503–CV–121.

Court of Appeals of Indiana.

Aug. 26, 1996.

Rehearing Denied Oct. 29, 1996.

Robert G. Barker, Jerry A. Garau, Price & Barker, Indianapolis, Joseph Z. Epstein, Pryor, Cashman, Sherman & Flynn, New York City, James W. Riley, Jr., Charles P. Edwards, Riley, Bennett & Egloff, Indianapolis, for Appellants–Defendants.

Douglas R. Brown, Peter S. Kovacs, Stewart & Irwin, Indianapolis, for Appellees–Plaintiffs.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Third-party Defendant–Appellant International Creative Management, Inc. (hereinafter "ICM") appeals from the denial of its motion to compel arbitration in an ongoing dispute with third-party plaintiffs-appellees D & R Entertainment Co., Inc., C. Ray Donaldson and Willie C. Rhodes d/b/a D & R Productions, and Reginald Atkins (hereinaf-

ter collectively referred to as "D & R Entertainment" or "D & R").

We reverse and remand with instructions.

## ISSUES

One issue is dispositive of this appeal: Whether the trial court erred by refusing to direct arbitration of the parties' breach of contract dispute pursuant to the Indiana Uniform Arbitration Act.

## FACTS AND PROCEDURAL HISTORY

This appeal is taken jointly from three separate orders issued by the Marion Superior Court. Each of these orders denied the appellants' applications to compel arbitration pursuant to Ind.Code 34–4–2–3(a) (1993). Defendants Perri A. Reid d/b/a "Pebbles," Reidstein, Inc. and P.T. Entertainment (hereinafter collectively referred to as "the Pebbles Defendants") and ICM, as third-party defendants, filed two separate appeals from the orders of the trial court. The Pebbles Defendants petitioned this court to join their appeal with ICM's appeal, and we granted the motion in May of 1995.

Specifically, ICM appeals from the trial court's November 15, 1994, order denying its application and motion to compel arbitration and to stay further proceedings. (R. 587–88). ICM also appeals from the trial court's March 10, 1995, order denying its motion to reconsider. (R. 757–58). The Pebbles Defendants appeal from the trial court's February 22, 1995, order which denied their petition to compel arbitration and stay further proceedings. (Supp.R.6–7).

D & R is a partnership that was formed by Reginald Atkins, Willie Rhodes and Ray Donaldson for the purpose of promoting a July 11, 1991, concert at the Fort Wayne Memorial Coliseum. Rhodes and Donaldson agreed to provide the financial backing for the concert and formalized this agreement by creating a corporation called D & R Entertainment Company, Inc. Defendant Perri A. Reid is a popular music artist who performs under the stage name "Pebbles." Defendants Reidstein, Inc. and P.T. Entertainment are Reid's affiliated companies. Defendant Hi–Five is also a popular music group, and its entertainment services are furnished by Defendant Hi–Five Music, Inc. Likewise, Defendant Father M.C. is a popular music artist. ICM is an artist's agent, which is essentially an employment agency that deals exclusively with theatrical talent.

In 1991, George Valentine, an experienced concert promoter in Indianapolis, became interested in promoting a local concert for MTV's multi-city tour. Ultimately, he was unable to secure an agreement to promote an MTV concert, so he decided to promote a concert independently. Reginald Atkins, an acquaintance of Valentine, introduced Valentine to Ray Donaldson, a former Indianapolis Colts player, to provide the financial backing for the project. Neither Donaldson, Rhodes, nor Atkins had prior promotion experience.

In furtherance of the project, Valentine began speaking with True Warner, a promoter's booking agent in California. In negotiating a deal generally, Valentine and Warner would discuss which artists they wanted, Warner would then contact a firm such as ICM, and negotiate the particulars with the artist's agent. In this particular case, Warner contacted ICM on Valentine's behalf. Around the 20th of June, Delaney McGill, an agent from ICM in New York City, negotiated the following package: Pebbles would perform at the concert for a guaranteed $12,500, plus an additional payment based on box office receipts; and Hi–Five would perform at the concert for $5,000. Warner told McGill that Valentine would be acting as promoter and the contracts should be sent directly to him. McGill also tentatively offered Father M.C. as a third performer for $4,000, but stipulated that he would have to verify availability.

It was the customary practice for the promoter to send a good-faith deposit of one-half of the total price to the artist's agent. Upon receipt of the good-faith payment, the artist's agent would then contact the artist's management to see if the artist was interested in the performance. If so, the artist's agent would prepare an engagement contract and send it to the promoter to be signed. Typically, this contract is on the talent agency's (such as ICM) form with blank spaces for the particulars of the concert to be filled in.

Standard terms, such as arbitration clauses, are on the reverse side, and often there is an artist's rider with the artist's technical and personal requirements.

Valentine, in keeping with the customary practice, directed Donaldson to send the one-half deposits for Pebbles and Hi–Five. On June 20, 1991, Donaldson remitted to ICM via electronic funds transfer the deposits of $6,250 for Pebbles and $2,500 for Hi–Five. Five days later, he remitted an additional $2,000 for Father M.C. During this time, the Fort Wayne Coliseum was also reserved. Following the receipt of the deposits, McGill in New York sent Valentine two ICM form engagement contracts dated June 21, 1991, with the particulars filled in and with the artists' riders attached. Valentine met with Atkins to obtain the necessary consensus before signing the contracts. Over the next several days, Atkins, Donaldson and Rhodes decided that they wanted to promote the concert themselves, without Valentine's help.

D & R Productions was consequently formed and Warner directed ICM to issue new engagement contracts reflecting the change in promoter from Valentine to D & R. Warner received the revised contracts in California and contemporaneously learned that Father M.C. could not perform on July 11th. Warner immediately made arrangements with ICM for the return of the $2,000 deposit. Warner then forwarded the new Pebbles and Hi–Five contracts to Atkins in Indianapolis. Warner directed Atkins to sign the contracts and return them immediately to ICM in New York so that they would arrive prior to the concert date. At this point, although Warner realized that the artists would probably not be able to sign the contracts prior to the show, she fully expected that if ICM had the contracts in hand, the artists would show up to perform the concert pursuant to the contracts.

Pebbles and Hi–Five arrived at the Fort Wayne Coliseum during the early afternoon on the day of the concert. The contract provided that all "payments shall be paid by certified check, money order, bank draft, or cash." (R. 277, 280). The contract also specified that the amounts due shall be paid "prior to performance on night of above en-gagement or ACT WILL NOT PERFORM." (emphasis in original) (R. 277, 280). Prior to the concert, Donaldson, Rhodes, Atkins, and the Pebbles Defendants' road manager met with coliseum officials to pay the artists the remainder owed for their performances. Pebbles and Hi–Five were tendered the exact amount due them, but Pebbles's payment was not all in cash, as provided in the contract. The artists consequently refused to perform and the concert was canceled.

This litigation began in December of 1991, when D & R Entertainment filed a complaint against the Pebbles Defendants, Hi–Five, Hi–Five Music, Inc., Father M.C. and ICM. It was alleged by D & R Entertainment that the defendants breached a purported oral agreement of June 20, 1991, to perform at a concert at the Fort Wayne Memorial Coliseum on July 11, 1991, which D & R was promoting. (R. 38–46). The complaint asserts claims for breach of contract and unjust enrichment.

Defendants Hi–Five, Hi–Five Music, Inc. and Father M.C. (hereinafter collectively referred to as "the Hi–Five Defendants") are not parties to this appeal. On March 17, 1995, the trial court entered default judgments against the Hi–Five Defendants and awarded damages in favor of D & R Entertainment in the amount of $635,000. (R. 37).

The Pebbles Defendants and ICM filed separate motions for summary judgment asserting that a June 28, 1991, written contract (hereinafter referred to as "the June 28th Reidstein Contract") between the Pebbles Defendants and D & R was the controlling agreement between the parties. ICM also sought summary judgment on the ground that it was an agent for a disclosed principal. (R. 277–78). D & R served opposition affidavits averring reliance on the June 20th oral agreement. (R. 491–96). ICM moved to strike portions of these affidavits because D & R had given contradictory deposition testimony, i.e. had given testimony that they believed the June 28th Reidstein Contract to be controlling. (R. 509–513). The trial court granted the motion to strike in part. (R. 514–515; 559–564).

In January of 1994, the trial court granted ICM's motion for summary judgment and denied the Pebbles Defendants' motion. (R. 25). Thereafter the Pebbles Defendants filed an amended answer alleging for the first time the affirmative defense of arbitration. (Supp.R.9). Contemporaneously, the Pebbles Defendants filed the first in a series of motions to compel arbitration. (R. 516). The trial court denied Pebbles' first motion to compel arbitration. (R. 522). Pebbles did not appeal.

Pebbles then sought to have ICM joined to the lawsuit as a third-party defendant. The trial court granted this motion and on March 23, 1994, the Pebbles Defendants filed their third-party complaint against ICM. (R. 47–50). In ICM's answer, it alleged the affirmative defense of arbitration. (R. 51–66).

On October 17, 1994, ICM filed the second motion to compel arbitration of the dispute between D & R and Pebbles pursuant to Indiana's Uniform Arbitration Act. (R. 524). As it had denied Pebbles' motion to compel arbitration, the trial court denied ICM's motion as well. (R. 585–590).

Over the next several months, the Pebbles Defendants proceeded by filing a second motion for summary judgment and a third motion to compel arbitration. (R. 591; Supp.R. 1–5). Both of these motions were denied. (R. 709; Supp.R. 6–8).

On March 9, 1995, ICM filed its motion for reconsideration of its motion to compel arbitration, which constituted the fourth attempt to compel arbitration in this case. (R. 711–714). In keeping with its prior rulings, the trial court again denied the motion. (R. 757–759). This joint appeal ensued.

## DISCUSSION AND DECISION

The broad substantive issue presented in this appeal is: Whether the trial court properly denied ICM and the Pebbles Defen-

dants' motions to compel arbitration under the Indiana Uniform Arbitration Act. In order to resolve this issue, we must determine whether the June 28th Reidstein Contract or the June 20th oral contract is controlling. The June 28th Reidstein Contract contained the following arbitration clause:

> Any claim or dispute arising out of or relating to this agreement or the breach thereof shall be settled by arbitration in New York, New York in accordance with the rules and regulations then obtaining of the American Arbitration Association governing the three-member panels. The parties hereto agree to be bound by the award in such arbitration and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction thereof.

(R. 278, 281).

## I. Procedural Arguments

D & R asks us to dismiss this appeal for several reasons. First, they contend that the orders appealed from are neither final appealable orders nor appealable interlocutory orders. Second, they contend that the appeal was not timely filed.

On July 18, 1995, after the ICM and Pebbles appeals were joined, D & R moved to dismiss the appeal on jurisdictional grounds. The arguments we now address are substantially the same arguments that we addressed and rejected when we denied D & R's motion to dismiss.[1] When D & R reasserted in their appellate brief the jurisdictional arguments raised in their motion to dismiss, the appellants filed a motion to strike that portion of the brief arguing that the issues had already been determined. In February of 1996, Chief Judge Sharpnack issued an order denying the appellants' motion to strike; however, he stated that the appellants were under no obligation to include "reargument" concerning the motion to dismiss in their

---

1. Although these issues come before us in a unique procedural posture, the revisiting of an issue after a motion to dismiss the appeal on the same grounds has been denied is not unprecedented. In *Chesterfield Management, Inc. v. Cook*, the appellee filed a motion to dismiss the appeal arguing that the trial court's order denying an application for stay of arbitration was not

appealable because it was not interlocutory and was not certified pursuant to either Ind.Appellate Rule 4(B)(6) or Ind.Trial Rule 54(B). We denied the motion, yet still addressed the issues in our subsequent decision for the purpose of "provid[ing] future guidance to counsel." 655 N.E.2d 98, 100 (Ind.Ct.App.1995), *reh'g denied, trans. denied.*

reply brief. The appellants were granted ten days to file their reply brief "on the merits."

Basically, the issue that we are asked to review is whether this court has jurisdiction under the Indiana Uniform Arbitration Act to review an order denying an application to compel arbitration. Ind.Code 34–4–2–19(a) (1993) provides that "[a]n appeal may be taken from: (1) an order denying an application to compel arbitration made under section 3 of this chapter...." Ind.Code 34–4–2–19(b) further provides that "[t]he appeal shall be taken in the manner and to the same extent as from orders or judgments in a civil action." D & R's position is essentially that an order denying a petition to compel arbitration must be certified pursuant to Appellate Rule 4(B)(6) in order to be appealable to this court.

■ D & R cites two cases in support of its argument: *Evansville–Vanderburgh School Corp. v. Evansville Teachers Assn.*, 494 N.E.2d 321 (Ind.Ct.App.1986) and *Albright v. Edward D. Jones & Co.*, 571 N.E.2d 1329 (Ind.Ct.App.1991), *trans. denied, cert. denied Edward D. Jones & Co. v. Carter*, 506 U.S. 818, 113 S.Ct. 61, 121 L.Ed.2d 29 (1992). Both of these cases dealt with appeals from orders granting petitions to compel arbitration, and are thus inapposite. The case before us involves an order denying a petition to compel arbitration which Ind.Code 34–4–2–19 (a) specifically provides is appealable as a matter of right. *See Kansas Gas & Electric Co. v. Kansas Power & Light Co.*, 12 Kan.App.2d 546, 751 P.2d 146, 149 (1988), *rev. denied* (an order denying a motion to compel arbitration is appealable as a matter of right); *see also Baxter v. John Weitzel, Inc.*, 19 Kan.App.2d 467, 871 P.2d 855, 857 (1994), *rev. denied.* In states that have adopted Section 19 of the Uniform Arbitration Act without change, courts have held uniformly that an order denying a motion to compel arbitration is appealable as a matter of right. *Kansas Gas & Electric*, 751 P.2d. at 149; *see Rocz v. Drexel Burnham Lambert, Inc.*, 154 Ariz. 462, 743 P.2d 971 (Ct. App.1987); *Town of Danvers v. Wexler Construction Co., Inc.*, 12 Mass.App. 160, 162 n. 3, 422 N.E.2d 782 (1981); *Hennepin County v. Ada–Bec Systems*, 394 N.W.2d 611, 613

(Minn.Ct.App.1986), *rev. denied; Blow v. Shaughnessy*, 68 N.C.App. 1, 12, 313 S.E.2d 868 (1984), *rev. denied; Docutel Olivetti v. Dick Brady Systems, Inc.*, 731 P.2d 475, 477–78 (Utah 1986). Our statute is virtually identical to the Kansas statute, and both are modeled after the Uniform Arbitration Act. The Indiana Legislature adopted the Uniform Arbitration Act in 1969. *PSI Energy, Inc. v. Amax*, 644 N.E.2d 96, 99 (Ind.1994). We therefore hold that the trial court's orders denying ICM and the Pebbles Defendants' petitions to compel arbitration are appealable as a matter of right, and as such need not be certified.

■ D & R also asserts that the appellants' right to appeal arose from the denial of the Pebbles Defendants' first petition to compel arbitration, which was filed on February 2, 1994, and denied without prejudice on February 23, 1994. The subsequent petitions, D & R asserts, were repetitive and could not serve to "manufacture" an appealable order. Hence, D & R contends that the appeals are untimely. We disagree. The first petition to compel arbitration relied exclusively on the June 28th Reidstein Contract. D & R responded by arguing that the purported oral contract controlled. The appellants' subsequent petitions to compel set forth the factual evidence to establish that the June 28th Reidstein Contract was the operative agreement between the parties. Hence, these motions were substantively different and not in any way calculated to expand the time in which to appeal, as suggested by D & R. In fact, ICM and the Pebbles Defendants were seeking to expedite the progress of the case by seeking to enforce arbitration. We hold that the appeals were timely taken.

## II. Substantive Arguments

■ D & R's sole substantive argument is that the parties are not bound by the terms of the written contract because the Pebbles Defendants did not sign the contract. In situations where fewer than all the proposed parties execute the document we look to the intent of the parties as determined by the language of the contract to determine who may be liable under the agreement. It

should be assumed that all the parties who sign the agreement are bound by it unless it affirmatively appears that they did not intend to be bound unless others also signed. *Kruse Classic Auction Co., Inc. v. Aetna Cas. & Sur. Co.*, 511 N.E.2d 326, 328 (Ind.Ct.App. 1987), *reh'g denied, trans. denied.*

It is undisputed that the contract contained the following standard clause: "THIS CONTRACT NOT BINDING UNLESS SIGNED BY ALL PARTIES HERETO." (emphasis in original) (R. 277, 280). It is further undisputed that the contracts were not signed by the Pebbles Defendants. Therefore, D & R contends that because the written contract was not signed by the Pebbles Defendants, the arbitration language contained therein is not binding on the parties and the trial court correctly denied ICM and the Pebbles Defendants' respective motions to compel arbitration.

■ Arbitration is a matter of contract and a party cannot be required to submit to arbitration unless he has agreed to do so. *St. John Sanitary Dist. v. Town of Schererville*, 621 N.E.2d 1160, 1161 (Ind.Ct.App. 1993). Where a court is asked to compel or stay arbitration, it faces the threshold question of whether the parties have agreed to arbitrate the particular dispute. *Chesterfield Management*, 655 N.E.2d at 101. Of course then, before a court compels arbitration, it must first resolve any claims concerning the validity of the contract containing the arbitration clause. *PSI Energy*, 644 N.E.2d at 99. Once satisfied that the parties contracted to submit their disputes to arbitration, the court is required by statute to compel arbitration. *Id.; see* Ind.Code 34–4–2–3(a) ("On application of a party showing an agreement [to arbitrate] and the opposing party's refusal to arbitrate, the court shall order the parties to proceed with arbitration.") Judicial inquiry is thus limited to the validity of the contract containing the arbitration clause, not the construction of that clause. *PSI Energy*, 644 N.E.2d at 99.

■ Our review of the record does not convince us that an oral agreement of any sort existed between D & R and ICM on June 20, 1991, or on any date thereafter. The deposition testimony of the three individual plaintiffs makes clear that the only agreement between D & R and ICM was the June 28th Reidstein contract. D & R became a corporate entity on July 3, 1991, and sometime immediately thereafter, Willie Rhodes, on behalf of the newly formed D & R, signed the June 28th Reidstein contract and returned it to ICM in New York pursuant to True Warner's instructions. Any negotiation between Warner and ICM prior to June 20th, was done on behalf of Valentine as promoter, not D & R or the individual plaintiffs. In fact, Warner specifically stated in her affidavit as follows:

> From my personal dealings with Mr. McGill [of ICM] around June 20th, I know that he and I understood that our oral negotiations, where he represented the artists and I represented the promoter (then, George Valentine), were not contracts or intended to be legal agreements. As I have explained, it was intended that the written contracts with artists' riders which ICM issued for the promoters to sign would be the agreements.

(R. 506–07).

While Donaldson was involved in the first money transfer to ICM, his involvement was solely as financial backer, not promoter. At that time, Valentine was the only promoter involved in the transaction. The binder money which was sent to ICM to secure the engagement contracts was sent on behalf of Valentine. In fact, the trial court struck many paragraphs of the Atkins and Rhodes affidavits pursuant to ICM's motion. Therefore, we do not rely on any purported oral agreements between the parties.

Additionally, all parties were acting pursuant to the June 28th Reidstein contract: Pebbles and Hi–Five came to Fort Wayne for the purpose of performing the show pursuant to the written contract; D & R complied with the artists' catering and technical requirements which were located in an "artist's rider" attached to the two contracts; when D & R was unable to comply with the payment provision as contained in the written contract, it sought to settle the accounts with a check from the Coliseum. True Warner, based on her prior experience with ICM,

testified that she knew Pebbles was on tour and would probably not be able to sign the contract prior to the show. However, Warner said she believed that Pebbles would show up in Fort Wayne pursuant to the written contract and that the contract would control the relationship between the parties. (R. 500, 504). Warner also testified in her affidavit that the four of them (she, Atkins, Rhodes and Donaldson) considered the June 28th contracts to be the operative agreements. (R. 505).

Valentine, who has promoted approximately 30 concerts since 1986, testified in his affidavit that no deal is struck until he receives a written engagement contract from the artist's agency. Valentine further testified in his affidavit that based on his many years of experience in the concert promotion business, virtually every engagement contract that he has seen requires payment in the form of cash or guaranteed paper, and never would an artist accept a standard uncertified check as payment. He further stated that in his years of concert promoting, he does not recall "a single instance where the artist signed the engagement contract." (R. 538). He went on to state that

> [w]hen the promoter signs and returns the engagement contract to the artist's agent and all parties know that the promoter is preparing for the concert in accordance with the artist's requirements in the contract and rider as signed by the promoter, it is simply not necessary for the artist's company to sign the document when the artist comes to the venue. Provided payment is made as I have described, the artist will simply perform the concert as the contract states. That is what I expected to happen when I received the two June 21, 1991 transmittal letters and the ICM engagement contracts for Pebbles and Hi-Five's appearances in Fort Wayne.

(R. 538–39).

The trial court issued an order on November 15, 1994, denying ICM's motion to compel arbitration and stay these proceedings. In that order, the court stated that "ICM has failed to demonstrate that there exists an agreement described in I.C. § 34–4–2–1." (R. 588). Two days later, Pebbles filed a

motion for partial summary judgment arguing that the June 28th Reidstein Contract was the only agreement between the parties and asking the court to determine this as a matter of law. That motion was summarily denied on January 24, 1995. (R. 709). On March 9, 1995, ICM filed a motion for reconsideration of its application to compel arbitration and alternatively a motion for judgment on the pleadings. The trial court summarily denied this motion.

 Generally, the validity of a contract is not dependent upon the signature of the parties, unless such is made a condition of the agreement. *State v. Daily Exp., Inc.,* 465 N.E.2d 764, 767 (Ind.Ct.App.1984). However, some form of assent to the terms of the contract is necessary. *Id.* Assent may be expressed by acts which manifest acceptance. *Id.* For example, in *Rose v. Spa Realty Associates,* the New York Court of Appeals was asked to determine whether part performance pursuant to an oral modification to the parties' written contract was sufficient to take the oral modification outside of the statute of frauds. 42 N.Y.2d 338, 397 N.Y.S.2d 922, 366 N.E.2d 1279 (1977). The court relied on the parties' conduct and held that where both parties *act* as if they had agreed to the changed term, this conduct amounts to an indisputable mutual departure from the written agreement. *Id.* 397 N.Y.S.2d at 926–27, 366 N.E.2d at 1283. We find this analysis applicable to the facts before us. Here, although Pebbles did not sign the written contract, her actions pursuant to the contract amount to a manifestation of her acceptance of the terms of the contract. More importantly, D & R's actions pursuant to the terms of the contract amount to a manifestation of its intent to bind itself to the terms of the contract notwithstanding the absence of Pebbles's signature.

Because time is often scarce and artists in the music industry are often on tour during contract negotiations between their agent and the promoters, the absence of an executed written agreement does not always mean that there is no legally binding agreement. When sufficient proof of industry practice is introduced, courts have expressed a willingness to consider such practice when resolving

contract disputes. *See eg. Poe v. Michael Todd Co.*, 151 F.Supp. 801 (S.D.N.Y.1957). Here, True Warner and Valentine testified that it is a standard occurrence that artist's on tour do not have the opportunity to sign contracts; however, all parties act as if they are bound to the terms of the contract."

Performance pursuant to the contract amounted to an unambiguous and overt admission by both parties that a contract existed. Accordingly, we hold that the June 28th Reidstein Contract is an enforceable contract, and hence ICM and the Pebbles Defendants have met their burden of proving the existence of a written agreement to arbitrate pursuant to Ind.Code 34-4-2-1 (1993).

## CONCLUSION

Based on the foregoing, we reverse and remand to the trial court for entry of an order directing the parties to proceed to arbitration.

CHEZEM and BARTEAU, JJ., concur.