Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jul 24 2013, 6:29 am

*Kevin S. Smith*

**CLERK**

of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**RANDY J. SPITAELS**
Kindig & Sloat, P.C.
Nappanee, Indiana

ATTORNEY FOR APPELLEE:

**MICHAEL A. DERUCKI**
Bingham & Loughlin, P.C.
Mishawaka, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| HUBBARD HILL ESTATES, INC., | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 20A03-1301-SC-24 |
| | ) | |
| R. WYATT MICK, JR., individually and, | ) | |
| as personal representative of the Estate of | ) | |
| Harriet M. Seilon, Deceased. | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE ELKHART SUPERIOR COURT
The Honorable Charles C. Wicks, Judge
Cause No. 20D05-1205-SC-2932

**July 24, 2013**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**MATHIAS, Judge**

Hubbard Hill Estates, Inc. ("Hubbard Hill") appeals a judgment in favor of R. Wyatt Mick, Jr. ("Mick"), individually and as personal representative of the Estate of Harriet M. Seilon ("the Estate") for overpaid rent from Harriet M. Seilon's ("Seilon") account at the Hubbard Hill retirement community. The Elkhart Superior Court issued a total award of $3,150.00 plus costs, awarding $729.19 to Mick personally and $2,420.81 to the Estate. Hubbard Hill argues that the trial court's award is not supported by the evidence.

We agree and reverse.

**Facts and Procedural History**

On July 27, 1994, Seilon entered into a written lease agreement with Hubbard Hill for a studio apartment home in the Hubbard Hill assisted living community. Rent at the time of the original agreement was at $970 per calendar month, increasing over the course of time to $2,005 per calendar month. Amenities in her monthly rent included use of common areas, utilities, laundry, housekeeping, nursing care, nursing assessments, meals, and transportation. The lease was terminable at will by the tenant at any time, for any reason whatsoever, and keys were to be returned at the time that the tenant vacated the apartment. Hubbard Hill could terminate a lease upon necessary transfer or discharge of the tenant from the facility, or for health, safety or other reasonable purposes. Hubbard Hill also provided more intensive nursing care in a separate section of its facilities, specialized nursing care, medications, and other basic necessities at additional costs.

Seilon continued to reside in Hubbard Hill's assisted living section for the majority of her remaining eighteen years. She handled her own financial affairs until sometime in 2007, when she and her nephew, Mick, opened a joint account so he could handle her finances.

On December 3, 2010, Seilon was transferred to the nursing section of Hubbard Hill. Upon Seilon's transfer, Mick paid $6,090.00 for the costs of care in that section of the facility for the remaining twenty-nine days in the month of December. Seilon's regular assisted living apartment rent, in the amount of $2,005.00 was also paid early in the month. Since Seilon was in the nursing home section for most of December, her regular assisted living food credit of $290 was refunded, but Hubbard Hill received and kept $1,715.00 of her rent payment for December. In total, Hubbard Hill received a sum of $9,172.14 in payment on Seilon's account in December 2010.

Seilon passed away on December 16, 2010. Hubbard Hill credited $3,150.00 to Seilon's account, as a refund for pre-paid nursing care for fifteen days at $210 per day. Seilon's furnishings, clothing, and other personal effects remained in her studio apartment in the assisted living section until December 31, 2010. Mick agreed to have the furniture and other items distributed to Hubbard Hill's employees, but asked the head nurse of the assisted living section if he could keep Seilon's antique Hammond B3 organ with Leslie speaker in Seilon's apartment until the weather improved.[1] The head nurse

---

[1] The organ is valued between $3,500 and $6,000. Sherk's Piano Company, in Mishawaka, Ind., had previously informed Mick that moving the organ in freezing temperatures might ruin it, and suggested that Mick wait to move the organ until inclement weather subsided. We note that Hammond organs, especially the Hammond B3, and the accompanying Leslie speakers were used by many popular music groups of the 1960s and 1970s. For instance, the B3 is prominent in such popular songs as "Gimme Some Lovin" by the Spencer Davis Group, "Smoke on the Water" by Deep Purple, and "Whipping Post"

3

apparently allowed Mick to keep the organ in Seilon's apartment. Mick did not discuss storage facilities or fees with the Hubbard Hill business office. Mick also testified that he offered to have the organ moved out of the room to a different part of the facility, but was told that with ongoing construction, such a move was not feasible.[2] Hubbard Hill also refused to rent the apartment to another tenant while the organ remained in the apartment for fear of damaging it.

From January 1, 2011 until March 18, 2011, the organ was stored in the apartment.[3] Mick retained the key to the apartment until March 18, and he communicated periodically with Hubbard Hill regarding ongoing bills and removal of the organ. Meanwhile, Hubbard Hill did not show the apartment, and charged the full rental value ($2,005.00 per month) for the entire time that the apartment was used for storage. Hubbard Hill did credit Seilon's account with $840.41, since the apartment was vacated on the eighteenth of March.

In total, less food costs, Hubbard Hill collected $5,233.99 after Seilon's death. Hubbard Hill received full payment for rent for the months of December 2010,[4] January 2011, February 2011, and a pro-rated amount for March 2011. Including the $3,150.00 credited after Seilon's death, Seilon's account had sufficient funds to satisfy the majority of the additional rent payments. However, Mick, as personal representative for the Estate

---

by the Allman Brothers Band, just to name a few. And the Leslie speaker was used by itself to impart its characteristic sound to the vocals of John Lennon on the Beatles' psychedelic "Tomorrow Never Knows," the closing track of the 1966 Revolver album.

[2] The trial court concluded that Mick's conversations with the head nurse did not constitute a meeting of the minds to form a storage agreement.

[3] Mick's son and two other men moved the organ on March 18.

[4] Mick does not contest payment for the assisted living apartment during any part of the month of December 2010.

was billed for and sent two additional checks to Hubbard Hill: $336.25 on February 9, 2011, and $392.94 on May 11, 2011. Hubbard Hill deposited the entirety of this $729.19, which it applied to continued payment of full rent of the apartment.

On May 24, 2012, Mick filed his small claims complaint in Elkhart Superior Court. The complaint was classified as a refund of overpayment for nursing care. Mick only claimed he was owed a refund of $3,150.00 for nursing home care, which is equal to $210 per day for the fifteen days remaining in December after Seilon's death. On September 25, 2012, a bench trial was conducted, and the trial court took the matter under advisement. Hubbard Hill argued at the trial that Mick was not entitled to the refund since it had been applied to the full rental payments on the studio apartment for January and February 2011. Mick argued that Hubbard Hill could have rented the apartment and that he had discussed with a head nurse that the storage costs for the organ would not be equal to the usual rental cost.

The trial court issued a judgment on November 1, 2012 in favor of Mick. The trial court correctly noted that the dispute arose primarily from miscommunication between the parties. Additionally, the trial court found that Hubbard Hill had placed undue weight on the retention of keys in determining whether Seilon's lease had been terminated, and that it had options under law to remove the organ. Further, the trial court characterized the amount of money collected by Hubbard Hill, even if the $3,150.00 were refunded to Mick, as an amount that "would far exceed the amount of storage charges normally charged in the community even for a climate controlled facility." Appellant's App. p. 12. As a result, the trial court concluded that Hubbard Hill had been adequately compensated

5

for its storage of the organ, and that allowing Hubbard Hill to retain the $3,150.00 refund would constitute unjust enrichment. The trial court thereafter ordered that Mick, individually, be awarded $729.19, and as personal representative of the Estate, Mick also received a money judgment of $2,420.81. In total, the trial court awarded Mick and the Estate $3,150.00.

Hubbard Hill filed its motion to correct error on December 4, 2012 and argued that Mick had failed to meet his burden to present evidence as to a reasonable charge for storage and that the trial court had taken improper judicial notice of the fair market value of storage facility use. The trial court denied Hubbard Hill's motion, stating that Mick had no burden to show reasonable storage charge, that the trial court did not take judicial notice of typical storage costs, that the parties had stipulated the amount of the award, and that since Hubbard Hill had previously credited Seilon's account with the $3,150.00, it could not complain that the amount should not be refunded.

On December 31, 2012, Hubbard Hill filed a motion to reconsider the denial of the motion to correct error. On January 16, 2012, the trial court affirmed its denial of Hubbard Hill's motion to correct error. Hubbard Hill now appeals.

**Standard of Review**

Our standard of review of small claims judgments is well settled.

Judgments in small claims actions are subject to review as prescribed by relevant Indiana rules and statutes. Under Indiana Trial Rule 52(A), the clearly erroneous standard applies to appellate review of facts determined in a bench trial with due regard given to the opportunity of the trial court to assess witness credibility. This deferential standard of review is particularly important in small claims actions, where trials are informal, with the sole objective of dispensing speedy justice between the parties according to the rules of substantive law. But this deferential standard does

6

not apply to the substantive rules of law, which are reviewed *de novo* just as they are in appeals from a court of general jurisdiction.

Trinity Homes, LLC v. Fang, 848 N.E.2d 1065, 1067-68 (Ind. 2006) (internal quotations and citations omitted).

## Discussion and Decision

Hubbard Hill appeals the award of $3,150.00 to Mick and the Estate, on the grounds that Mick failed to provide evidence of the fair market value for storage, and the trial court's damage award was not supported by probative evidence. We restate this issue in two parts: (1) whether the trial court properly applied the doctrine of unjust enrichment to support its judgment; and (2) whether the trial court's damage award was supported by probative evidence.

The trial court relied on the doctrine of unjust enrichment to support its judgment. As application of the doctrine is a matter of substantive law, we review this application *de novo*. See Trinity Homes, LLC, 848 N.E.2d at 1068. Unjust enrichment allows a party to recover when a court applies the legal fiction of constructive contract. A constructive contract (also known as a quasi-contract or a contract implied at law) refers to a situation where no contract exists, but "justice nevertheless warrants a recovery under the circumstances as though there had been a promise." Ahuja v. Lynco Ltd. Med. Research, 675 N.E.2d 704, 709 (Ind. Ct. App. 1996), trans. denied. Thus, unjust enrichment operates where there is no governing contract. DiMizio v. Romo, 756 N.E.2d 1018, 1024-25 (Ind. Ct. App. 2001), trans. denied. In order "to prevail on a claim of unjust enrichment, a plaintiff must establish that a measurable benefit has been conferred on the defendant under such circumstances that the defendant's retention of the benefit

7

without payment would be unjust." Bayh v. Sonnenburg, 573 N.E.2d 398, 408 (Ind. 1991). The doctrine is typically applied against someone who receives the benefit of some service when the individual providing the service goes unpaid.

Hubbard Hill had a written lease agreement with Seilon and, as the personal representative of her estate, Mick chose and continued to pay rent under the terms of that contract.[5] While Mick argues that Seilon's death terminated the contract,[6] it is well settled under Indiana case law that the death of a party to a contract does not ordinarily extinguish a contract. See, e.g., Miller v. Ready, 59 Ind. App. 195, 108 N.E. 605, 608 (Ind. Ct. App. 1915). And here, Mick clearly chose to make continued use of the leased premises in order to protect Seilon's valuable antique organ from the winter weather. Under these facts and circumstances, absent a modification to the lease agreement negotiated with Hubbard Hill's business office, Mick as personal representative, and Seilon's Estate remained bound by the at-will lease agreement between Seilon and Hubbard Hill until the lease was officially terminated.

Further, Mick's conduct regarding Hubbard Hill's periodic billings and the allegations in Mick's small claims complaint indicate his implied agreement to abide by the terms of Seilon's lease agreement. In December 2010, Mick paid both the full amount of rent for Seilon's studio apartment and the full monthly nursing home charge to Hubbard Hill. Hubbard Hill appropriately refunded $3150 of the nursing home charge to Seilon's account, which amount represented the fifteen remaining days in December after

---

[5] The lease agreement does not contain a provision governing the terms of the contract upon the death of the tenant, but Mick clearly sought to make continued use of the leased apartment after Seilon's death.

[6] In his brief, Mick states that Seilon's death constituted notice to Hubbard Hill that Seilon would no longer be in need of the apartment unit. Appellee's Br. at 3.

8

her death. Hubbard Hill, believing that it could continue to charge rent because Seilon's organ remained in her apartment, applied these funds toward the January and February 2011 rent on the studio apartment per their contract with Seilon.

In his small claims complaint, Mick did not claim overpayment of rent on Seilon's apartment for January, February or March 2011. In fact, Mick was billed for the full amount of rent on the apartment and paid the balance owed. See Ex. Vol, Defendant's Ex. I. Mick never negotiated a modification to the lease agreement or a new contract for storage with Hubbard Hill. Therefore, Hubbard Hill could have reasonably concluded that Mick agreed to continue to pay full rent under Seilon's lease until the organ was removed from the apartment. See, e.g., Int'l Creative Mgmt., Inc. v. D & R Entm't Co., Inc., 670 N.E.2d 1305, 1312 (Ind. Ct. App. 1996), trans. denied (holding that actions taken pursuant to a contract's terms may be sufficient to establish assent to the contract, even in the absence of express assent).

The trial court in this case characterized the receipt of full rent in exchange for the storage of an organ in an otherwise unoccupied room as unjust enrichment. However, the doctrine of unjust enrichment is inapplicable to the circumstances presented in this appeal. Mick did not provide a measurable benefit to Hubbard Hill for which he remains unpaid. As we noted above, in his complaint, Mick claimed only a refund for nursing care that Hubbard Hill had already been refunded to Seilon's account. Mick first raised the issue of an agreement for storage fees at the small claims hearing. However, the trial court appropriately found that Mick and Hubbard Hill did not have any agreement for storage of Seilon's organ.

Despite the lack of agreement, the trial court concluded that if Mick was awarded a judgment of $3150, after subtracting that amount from the total funds paid on Seilon's account, Hubbard Hill would receive "$2083.99 in storage charges for an approximate three month period which is almost $700 a month for storage." Appellant's App. p. 12. The court then concluded that $700 per month "would far exceed the amount of storage charges normally charged in the community even for a climate controlled facility." Id. However, there is simply no evidence in the record establishing reasonable monthly storage fees for Seilon's antique organ.

Without such evidence, we are unable to affirm the trial court's judgment. Under the facts and circumstances of this case, we can conclude that paying $2,005 per month for a vacant studio apartment simply to store an organ is excessive.[7] However, Mick failed to submit any evidence to establish reasonable storage fees for Seilon's organ. Hubbard Hill's refusal to refund a portion of Mick's payments is certainly bad business practice and unreasonable, but Mick cannot prevail where he failed to properly prove his claim. We are sympathetic to the trial court's attempt to reach an equitable result, but there is no proper legal rationale for its judgment and no evidence to support the amount of the award.

**Conclusion**

For all these reasons, we hold that the trial court improperly applied the doctrine of unjust enrichment in this case. Further, Mick failed to introduce evidence to support

---

[7] This is particularly true in this case where a certain percentage of the rental fee included charges for basic nursing care, housekeeping, utilities, and other amenities.

the trial court's findings with respect to reasonable storage fees.  Therefore, the trial court's award is not supported by probative evidence.  Accordingly, we reverse.

Reversed.

MAY, J., concurs.

BAKER, J., dissents with opinion.

# IN THE
# COURT OF APPEALS OF INDIANA

HUBBARD HILL ESTATES, INC.,⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀Appellant-Defendant,⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀vs.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀No. 20A03-1301-SC-24
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
R. WYATT MICK, JR., individually and, as⠀⠀)
personal representative of the Estate of Harriet M.⠀)
Seilon, Deceased,⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀Appellee-Plaintiff.⠀⠀⠀⠀⠀⠀⠀)

**BAKER, Judge, dissenting.**

Because I do not believe that the lease survived Seilon's death and that no contract was formed for the storage of the organ, I cannot agree that the trial court erred in awarding Mick and the Estate the $3,150 refund. Thus, I must part ways with the majority.

While the majority is correct that generally, the death of party to a contract does not terminate the contract, there are a few exceptions to this rule. Miller v. Ready, 59 Ind. 195, 108 N.E. 605, 608 (Ind. App. 1915). A nonexhaustive list includes contracts of authors to write books, attorneys for professional services, doctors to cure particular ailments, teachers, and masters to instruct apprentices. Id. These "contracts are sometimes denominated contracts for personal services." Id. Here, I think that Seilon's lease with Hubbard Hill was more analogous to a contract for personal services insofar as it was assisted living care, which is something that is a personal service to Seilon. Thus, I believe that Seilon's death terminated her contract with

Hubbard Hill. Moreover, I believe that placing undue emphasis on Mick's failure to return the key to Seilon's apartment is missing the proverbial forest for the trees.

Moving forward to the storage of the organ, I agree with the majority that Mick and Hubbard Hill did not have a storage agreement for the organ. First, although Mick "contends" that the head nurse told him that he could store the organ for $300 per month, the trial court noted this testimony and specifically concluded that "[t]here was never a meeting of the minds between the parties as to any contract for storage charges." Appellant's App. p. 9, 11.

Likewise, I agree that the trial court improperly applied the doctrine of unjust enrichment insofar as Mick did not provide Hubbard Hill with some measurable benefit for which he remains unpaid. Indeed, it seems that Hubbard Hill is responsible for recovering in quantum meruit for any storage fees it believes it is owed in the absence of a formal contract. See Carr. v. Pearman, 860 N.E.2d 863, 870 (Ind. Ct. App. 2007) (quoting Galanis v. Lyons & Truitt, 715 N.E.2d 858, 861 (Ind. 1999)) (stating that "'[q]uantum meruit is an equitable doctrine that prevents unjust enrichment by permitting one to recover the value of work performed or material furnished if used by another and if valuable'") (emphasis added).

That said, it should be noted that Hubbard Hill has already received $2,005 in rent for the studio apartment from December 2010 and $6,090 for a semi-private room in the nursing facility to which Seilon was admitted on December 3, 2010. Seilon died on December 16, 2010, and Mick made no claim for a refund for the studio apartment for the period between December 3 and December 31, during which the apartment was used for storage. Perhaps, Hubbard Hills has already recovered what was equitable in the absence of a contract. For these reasons, I would affirm the trial court.

Accordingly I dissent.

13