**Claudia RUETH a/k/a Claudia Firrek,
Appellant (Defendant Below),**

v.

**John QUINN and Kathleen Quinn,
Appellees (Plaintiffs Below).**

No. 45A04–9502–CV–34.

Court of Appeals of Indiana.

Jan. 12, 1996.

Transfer Denied May 28, 1996.

Michael L. Muenich, Highland, for appellant.

Timothy O. Malloy, George C. Patrick, Schreiner & Malloy, P.C., Schererville, for appellees.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

Claudia Rueth appeals the trial court's judgment ordering her to: 1) return John and Kathleen Quinns' $1,100.00 security deposit, and 2) pay the Quinns' attorney $750.00. We affirm in part, reverse in part, and remand.

### ISSUE

Did the trial court err in ordering Rueth: 1) to return the Quinns' $1,100.00 security deposit, and 2) to pay the Quinns' attorney $750.00?

### FACTS

In 1991, Claudia Rueth owned a home in St. John, Indiana, which she leased to John and Kathleen Quinn. The lease, which is dated December 5, 1991, covered the period from January 10, 1992 to June 10, 1992, a five-month lease. The monthly rent was $1100.00, payable on the tenth of each month. The lease further contained the following pertinent provisions:

> The security deposit of $1100.00 is not considered the first or last month's rent.

> The parties of the second part, Mr. and Mrs. Jack Quinn shall have the first right to refuse should the property at 9760 Hickory Lane, St. John, Indiana 46373 go on the market for sale.

(R. 85). The lease did not require notice of renewal or notice of extension. After the written lease expired on June 10, 1992, Rueth continued to accept monthly rent payments from the Quinns.

In July or August 1992, after the written lease had expired, Rueth advised the Quinns that she was considering selling the house. During the fall, Rueth advised the Quinns that the house was for sale. The Quinns expressed an interest in buying the house; however, their negotiations with Rueth terminated when the Quinns told Rueth that they would not pay over $175,000.00 for the house. On November 16, 1992, Rueth accepted a $190,000 offer on the house from a third party.

In mid- to late November, Rueth gave the Quinns verbal notice of the sale and advised them that they would need to vacate the house at the end of December, 1992, because the purchasers wanted to be in the house by Christmas. The Quinns asked Rueth if they could stay in the house until early January because the house they were purchasing was still under construction, and Mr. Quinn's elderly aunt, who lived with the Quinns, was ill. Rueth told the Quinns that she would talk to the purchasers to see if they would wait until after Christmas to take possession. Rueth then worked out an agreement with the purchasers so that the Quinns could stay in the house through Christmas. However, Rueth told the Quinns that they had to be out of the house by January 15, 1993, because closing was scheduled for not later than that date, and the contract between Rueth and the

purchasers provided that Rueth would surrender possession of the premises to the purchasers on or before January 15. Rueth further told the Quinns that the contract provided that if Rueth failed to surrender possession of the premises by January 15, Rueth would have to pay the purchasers $60.00 per day as liquidated damages. According to Rueth, she asked the Quinns if she "[had] to put this in writing," and the Quinns said, "no, we understand. Don't bother writing." (R. 145).

In early January 1993, the Quinns had not vacated the premises, and Rueth reminded them that she had to have possession of the house by January 15. According to Rueth, she "thought [they] were operating on a friendly basis and [she] trusted them to be out." (R. 136). The Quinns told Rueth that they did not know when they would get out because they did not know when they could take possession of and occupy their new house. Rueth and the Quinns agreed that Rueth would take the rent owed for the days in January after the 10th out of the Quinns' security deposit.

On January 11, 1993, Rueth sent the Quinns the following letter:

This is to inform you that you must be out of the house at 9760 Hickory Lane, St. John Indiana by 9:00 A.M. on Friday the 15th of January. Per my sales agreement and my agreement with you of the 17th of Nov. 1992, the buyer of the house was willing to extend the possession date to allow you to remain in the house over Christmas and to allow you enough time to relocate. He is unwilling to wait any longer. Bill's Movers in Highland Indiana has time to move you over the 13th and 14th of January and also has space to store your things if need be.

Please notify me of your plans by the 13th of January or sooner if possible.

(R. 104).

The Quinns received the demand on January 12; however, they did not leave the premises by January 15.[1] As a result, Rueth was unable to close the sale of her house pursuant to the terms of the contract with the purchasers. Both the realtor and the purchasers were threatening to sue Rueth. The Quinns moved out on January 18, and Rueth was able to close the sale on January 19. As a result of the delay, Rueth paid the purchasers $400.00, $100.00 per day, to compensate them for the late closing.[2] Rueth also had to pay $100.00 late closing charges to Lake Mortgage Company. On January 29, 1993, Rueth provided the Quinns with the following statement of damages:

Here is the final statement on the house you rented from me at 9760 Hickory Lane, Saint John, Indiana.

| $1100.00 | Security Deposit used as your last month rent |
| −660.00 | for 18 day occupancy (36.67 per day)[3] |
| −400.00 | penalty paid for not vacating on the 15th (I had to pay to the purchaser) |
| −100.00 | late fees paid to Lake Mortgage for late closing |

−60.60   I am out because you did not vacate when we agreed. I am sorry that we had to end on this note.

(R. 109).

On July 2, 1993, the Quinns filed a complaint in small claims court alleging that Rueth had failed to return their security deposit. The Quinns demanded a $816.13 judgment against Rueth. (R. 12). At trial, Mr. Quinn requested his security deposit less

---

1. According to Rueth, Mr. Quinn stated that he did not trust Rueth's mover, and was not going to let just anybody pack him up and move him. Quinn's mover was "booked up" and could not move the Quinns on or before January 15. (R. 97).

2. Although the sales contract between Rueth and the purchasers provided that Rueth would pay the purchasers $60.00 per day as liquidated damages, Rueth testified that she paid the purchasers $100.00 per day "because [she] was under duress, because [the purchasers] were threatening to sue [her] for not completing the contract at the 15th, and [she] just paid it." (R. 139).

3. Rueth admitted at trial that this calculation was erroneous. According to Rueth, she was "so upset ... [because] everyone was screaming at [her]" that she calculated the rent from January 1 to January 18, rather than from January 10 to January 18. Our calculations reveal that eight days of rent at the parties' stipulated $36.67 per day is $293.36.

the rent which he and his wife owed Rueth for the period January 10–18 and, pursuant to the security deposit statute, $1,228.16 for attorney fees. Following a bench trial, the trial court ordered Rueth to: 1) pay the Quinns $1100.00, and 2) pay the Quinns' attorney $750.00. The trial court did not make any findings of fact or conclusions of law.

### DECISION

██ When the trial court makes no findings of fact, we presume the judgment is based on findings supported by the evidence. *Union Federal Sav. v. INB Banking Co.* (1991), Ind.App., 582 N.E.2d 426, 428. We must affirm the trial court's judgment if it can be sustained on any legal theory supported by the evidence. *Id.* When making this determination, we do not reweigh the evidence or assess the credibility of witnesses. Instead, we consider only the evidence most favorable to the judgment together with all reasonable inferences drawn therefrom. *Id.*

Rueth argues that the trial court erred in ordering her: 1) to return the Quinns' $1,100.00 security deposit, and 2) to pay the Quinns' attorney $750.00. We agree that the trial court erred in ordering Rueth to return all of the Quinns' security deposit; however, the trial court did not err in ordering Rueth to pay the Quinns' attorney $750.00.

Ind.Code 32–7–5–1 through –19 concern the duties of landlords to return security deposits to tenants. The provisions most relevant to our decision, which are found in I.C. 32–7–5–12, 13, and 14, provide:

**32–7–5–12(a)** Upon termination of the rental agreement, all of the security deposit held by the landlord shall be returned to the tenant, except for any amount applied to:

(1) The payment of accrued rent;

(2) The amount of damages that the landlord has or will reasonably suffer by reason of the tenant's noncompliance with the law or the rental agreement; and

(3) Unpaid utility or sewer charges that the tenant is obligated to pay under the rental agreement;

all as itemized by the landlord in a written notice delivered to the tenant together with the amount due within forty-five (45) days after termination of the rental agreement and delivery of possession. The landlord is not liable under this subsection until supplied by the tenant with a mailing address to which to deliver the notice and amount prescribed by this subsection. Unless otherwise agreed, the tenant is not entitled to apply a security deposit to rent.

(b) If the landlord fails to comply with subsection (a), the tenant may recover all of the security deposit due the tenant and reasonable attorney's fees.

(c) This section does not preclude the landlord or tenant from recovering other damages to which either is entitled.

(d) The owner of the dwelling unit at the time of the termination of the rental agreement is bound by this section.

**32–7–5–13** A security deposit may be used only for the following purposes:

(1) To reimburse the landlord for actual damages to the rental unit or any ancillary facility that are not the result of ordinary wear and tear expected in the normal course of habitation of a dwelling.

(2) To pay the landlord for all rent in arrearage under the rental agreement, and rent due for premature termination of the rental agreement by the tenant.

(3) To pay for the last payment period of a residential rental agreement where there is a written agreement between the landlord and the tenant that stipulates the security deposit will serve as the last payment of rent due.

(4) To reimburse the landlord for utility or sewer charges paid by the landlord that:

(A) Are the obligation of the tenant under the rental agreement; and

(B) Are unpaid by the tenant.

**32–7–5–14** In case of damage to the rental unit or other obligation against the security deposit, the landlord shall mail to the tenant, within forty-five (45) days after the

termination of occupancy an itemized list of damages claimed for which the security deposit may be used as provided in section 13 [IC 32–7–5–13] of this chapter, including the estimated cost for each damaged item and the amounts and lease on which the landlord intends to assess the tenant. The list must be accompanied by a check or money order for the difference between the damages claimed and the amount of the security deposit held by the landlord.

### A. *Timeliness of the Notice*

Rueth sent the Quinns an itemized list of damages on January 29, 1993. We must first determine whether Rueth's letter complied with the 45 day statutory notice provision. This court has previously determined that the termination of the lease agreement triggers the notice provision. *Figg v. Bryan Rental, Inc.,* (1995), Ind.App., 646 N.E.2d 69, 73, *reh'g denied, trans. denied.* Termination of the lease agreement occurs when the tenant surrenders the tenancy and the landlord accepts the tenant's surrender. *Mileusnich v. Novogroder Co., Inc.* (1994), Ind.App., 643 N.E.2d 937, 939, *reh'g denied.* "Surrender and acceptance will be determined on a case by case basis by examining the acts of the respective parties in each case." *Id.*

Here, the parties' written lease covered the period from January 10, 1992 to June 10, 1992. When the written lease expired, the Quinns continued to pay rent and Rueth continued to accept it. In the absence of an agreement to the contrary, when a tenant holds over beyond the expiration of the lease and continues to make rental payments, and the lessor does not treat the tenant as a trespasser by evicting him, the parties are deemed to have continued the tenancy under the terms of the expired lease. *Houston v. Booher* (1995), Ind.App., 647 N.E.2d 16. Further, when the original lease is for more than one year, the renewal lease is for a year at a time. *Id.* When the original lease is for less than a year, the renewal lease is a general tenancy.[4] According to Ind.Code 32–7–1–2:

[A]ll general tenancies, except those tenancies covering lands used for agricultural purposes, in which the premises are occupied by the consent, either express or constructive, of the landlord, shall be deemed tenancies from month to month.

■ Because the original written lease between Rueth and the Quinns was for less than one year, when the lease expired and the Quinns continued to pay rent and Rueth continued to accept it, the parties continued a general month to month tenancy under the terms of the expired lease.

■ In November 1992, Rueth told the Quinns that they had to move out by Christmas. However, the Quinns asked Rueth if they could stay in the house until early January because the house that they were purchasing was still under construction, and Mr. Quinn's elderly aunt was ill. Rueth worked out an agreement with the purchasers so that the Quinns could stay in the house through Christmas; however, Rueth told the Quinns that they had to be out of the house by January 15 because closing was scheduled for not later than that date. The Quinns told Rueth that the parties did not need to put it in writing. The conversation between Rueth and the Quinns in which Rueth told the Quinns that they had to be out of Rueth's house by January 15 because of the scheduled closing and to which the Quinns responded that Rueth did not have to put it in writing was sufficient to constitute an oral agreement to extend the lease until January 15, 1993. *See Myers v. Maris* (1975), 164 Ind.App. 34, 326 N.E.2d 577, 582–83. ("[T]he conversation between Myers and Maris during the summer of 1965 in which Maris represented that the entire farm could be planted in corn the following year and to which Myers responded that he would need to purchase more equipment was sufficient to constitute an oral agreement to extend ... the lease for ... the 1966 crop year.")

■ On January 15, 1993, when the Quinns failed to leave Rueth's house, the Quinns became tenants at sufferance. "A tenancy at sufferance arises, when a man

4. General tenancies are "not fixed and made certain in point of duration by the agreement of the parties." *Brown's Administrators v. Bragg* (1864), 22 Ind. 122, 123.

comes into possession lawfully, but holds over wrongfully, after the determination of his interest." *Coomler v. Hefner* (1882), 86 Ind. 108, 110. *See also Lafary v. Lafary* (1988), Ind.App., 522 N.E.2d 916; *Jump v. Pilgrim Properties* (1947), 118 Ind.App. 164, 75 N.E.2d 165. The Quinns were tenants at sufferance from January 15 until January 18, when they moved out.

■ We conclude that the Quinns surrendered the premises when they moved out on January 18, and that Rueth accepted their surrender on that date. Accordingly, the lease agreement terminated on January 18. Rueth's letter was timely because it was sent on January 29, within 45 days of the termination of the lease agreement.

### B. *Sufficiency of the Notice*

We must next determine whether Rueth's letter complied with the notice requirement imposed by I.C. 32–7–5–12 and 14. We find that it does not.

In *Raider v. Pea* (1993), Ind.App., 613 N.E.2d 870, this court noted that because I.C. 32–7–5–12(a) requires a written, itemized notice, the landlord cannot simply retain the tenant's security deposit without explanation, but must specifically justify any deduction from the deposit for damages. This court has not addressed the ramifications when the landlord's deductions from the deposit are erroneous.

Here, Rueth deducted the following items from the Quinns' $1,100.00 security deposit:

$660.00—Rent from January 1 to January 18

$400.00—Penalty paid to purchaser

$100.00—Late Fees to mortgage company

Rueth concluded that she was "out" $60.60. Accordingly, Rueth returned nothing to the Quinns, and they filed a complaint requesting the court to order Rueth to return their security deposit. At trial, Rueth admitted that her rent calculation was erroneous and should have been $293.36.

■ Because a landlord is in a superior position to determine a tenant's damages, we find that when: 1) a landlord erroneously calculates the tenant's damages, 2) the tenant

resorts to legal action to collect all or part of his deposit, and 3) the tenant was entitled to a return of all or part of the tenant's deposit, the landlord has not complied with the notice requirement of the statute. Further, in such cases, pursuant to I.C. 32–7–5–12(b), the tenant is entitled to recover the "security deposit due the tenant and reasonable attorney fees."

Here, because Rueth did not comply with I.C. 32–7–5–12(a), we conclude the Quinns may recover all of the security deposit due them. Thus, we must determine exactly what part of the Quinns' security deposit was due them. The parties agree that they had previously agreed that Rueth was to subtract January rent for the period January 10 to January 18 from the Quinns' security deposit. Our calculations indicate that Rueth would be allowed to apply the Quinns' security deposit toward $293.36 in unpaid rent.

Further, pursuant to the statute, the landlord is permitted to apply the tenant's security deposit to the "amount of damages that the landlord has or will reasonably suffer by reason of the tenant's noncompliance with the law or the rental agreement."

Here, Rueth had to pay the Lake Mortgage company $100.00 because of the late closing. We find that the $100.00 due the mortgage company for the late closing is damages that Rueth reasonably suffered because of the Quinns' noncompliance with their agreement to vacate the premises by January 15. Accordingly, pursuant to the statute, Rueth would be permitted to apply the security deposit to the $100.00.

In addition, Rueth claimed that she kept $400.00 to cover a penalty paid to the purchasers because the house was not available for their possession on January 15. However, our review of the sales contract reveals that Rueth was required to pay the purchasers $60.00 per day as liquidated damages, not $100.00 per day. Further, Rueth had previously told the Quinns that she would have to pay the purchasers $60.00 per day as liquidated damages if she failed to surrender possession of the premises by January 15. However, at trial Rueth testified that she "just paid" the purchasers $400.00 because she was under "duress." (R. 139). Although

we find that the liquidated damages due to the purchasers because the house was not available for their possession are damages which Rueth reasonably suffered because of the Quinns' noncompliance with their agreement to vacate the premises by January 15, we decline to permit Rueth to apply $400.00 to the Quinns' security deposit. A landlord may not arbitrarily pay the purchasers more than required by contract and apply the payment to the tenant's security deposit. Rather, pursuant to the purchase agreement, Rueth was obligated to pay the purchasers $240.00 liquidated damages. Accordingly, she may apply $240.00 to the Quinn's security deposit.

As noted, *supra*, I.C. 32–7–5–12(b) provides that the tenant may also recover reasonable attorney fees when the landlord fails to comply with I.C. 32–7–5–12(a). Here, the trial court determined that $750.00 was reasonable attorney fees. The trial court has broad discretion in awarding attorney fees, and we will not disturb such award absent a clear abuse of discretion. *Cavazzi v. Cavazzi* (1992), Ind.App., 597 N.E.2d 1289, 1294. We find no such abuse here.

Our review of the record reveals that the trial court's judgment ordering Rueth to return the Quinns' entire security deposit cannot be sustained on any legal theory supported by the evidence. We affirm the award of attorney fees and reverse the trial court's judgment ordering Rueth to return the Quinns' entire security deposit. We remand this case to the trial court and direct the court to order Rueth to return $466.64 of the Quinns' security deposit to the Quinns.

Affirmed in part, reversed in part, and remanded.

KIRSCH, J., concurs.

CHEZEM, J., concurs in result.