

**FILED**
Jun 23 2023, 8:37 am
**C L E R K**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Duran L. Keller
Keller Law
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Jason W. Cottrell
Scotty N. Teal
Stuart & Branigin LLP
Lafayette, Indiana

# I N  T H E
# COURT OF APPEALS OF INDIANA

Xihui Wang,

*Appellant-Defendant,*
*Cross-Appellee,*

v.

Mingyu Sun,

*Appellee-Plaintiff*
*Cross-Appellant*

June 23, 2023

Court of Appeals Case No.
22A-SC-1473

Appeal from the
Tippecanoe Superior Court

The Honorable
Daniel J. Moore, Judge

Trial Court Cause No.
79D07-2112-SC-839

**Opinion by Judge Vaidik**
Judge Foley concurs.
Judge Tavitas concurs in part and dissents in part, with separate opinion.

**Vaidik, Judge.**

# Case Summary

Xihui Wang ("Tenant") rented a house in West Lafayette from Mingyu Sun ("Landlord"). Tenant paid the security deposit and first month's rent. After a dispute arose over the condition of the house, Tenant moved out and stopped paying rent. Landlord sued Tenant in small-claims court, and the court ultimately ruled that Tenant owed Landlord $38.76 plus $59.37 in court costs.

Tenant appeals and Landlord cross appeals, raising various issues. We affirm the trial court in some respects, reverse in others, and determine that Tenant owes Landlord $1,938.76 plus $59.37 in court costs.

# Facts and Procedural History

In August 2021, Tenant was a student at Purdue University and struggled to find a place to rent. Her friend, Landlord, was moving out of state and said she could rent his house in West Lafayette. Landlord sent a copy of a written lease to Tenant via text message. According to the written lease, (1) the lease was effective from September 1, 2021, to July 26, 2022; (2) the security deposit was $1,300; (3) the monthly rent was $1,300; (4) Tenant was responsible for certain utilities; and (5) Landlord "shall provide some furniture." Ex. Vol. III p. 5. Upon receiving the lease, Tenant texted Landlord that she couldn't sign it on her phone but that she would do so later when she had her computer. Tenant, however, never signed the lease.

[4] On August 5, Tenant paid a security deposit of $1,300. Landlord had the house cleaned by a company on August 28. *Id.* at 77. On September 1, Tenant paid $1,300 for the first month's rent and went to the house, but she didn't move in immediately. Landlord asked Tenant if there were any problems with the house, and Tenant said no, except that Landlord had left behind "a lot of stuff." *Id.* at 25. Landlord told Tenant to put the items she didn't want in one of the bedrooms (which he had reserved for himself in the lease) or throw them away. Two days later, on September 3, Tenant texted Landlord that there was "still" a "strong smell of cat pee" in the house and asked Landlord to have someone clean it. *Id.* at 26. Tenant explained that she had purchased odor-eliminator spray and ventilated the house, but it didn't help. Landlord had the carpets cleaned, but Tenant claimed that it "didn't solve the problem" because the cat urine was "everywhere," including the walls and floorboards. Tr. p. 68.

[5] According to Tenant, she cleaned the house until September 29, when she moved in. On October 3, Landlord texted Tenant that she needed to pay October's rent. The next day, Tenant responded that she wouldn't be paying October's rent because the house "has not reached a legally rentable standard at all. When we first went in, there was garbage, rotten food, and reflective cat urine stains." Ex. Vol. III p. 49. Tenant asked for the return of her security deposit and first month's rent. Landlord responded:

> I asked you to confirm the status of the house before you moved in. You have confirmed that there is no problem. And I have repeatedly said that if you need to clean up, I will find a professional person to clean up. If you need to clean up now, I

can still ask someone to clean up. And you have to know that according to our lease, I don't need to find someone to clean it up. There is no standard for renting in laws and contracts.

*Id.* Tenant didn't accept Landlord's offer to have the house cleaned again. Instead, Tenant emailed Landlord the next day and told him that she was terminating "the lease agreement" "[d]ue to the inhabitable [sic] conditions" in the house, including mold. *Id.* at 74. Landlord responded that Tenant needed to pay October's rent and that he would "find some experts to remove all the mo[]ld as well as odors at our expense." *Id.* Again, Tenant didn't accept Landlord's offer. Instead, she removed all her belongings from the house and returned the keys on October 20. *Id.*

[6] In January 2022, Landlord filed a small-claims complaint against Tenant for breach of contract.[1] Tenant counterclaimed for violation of Indiana's security-deposit statute and asked for the return of her security deposit plus attorney's fees.

[7] Landlord relet the house on March 21. On April 15, Landlord sent Tenant an itemized list of damages as required by the security-deposit statute.

[8] The trial was held in May 2022, and both parties were represented by counsel. Landlord testified that he had the house cleaned by a company in August before

---

[1] Landlord also sued Tenant for defamation, defamation per se, and trespass to chattels (for damage to his property). The trial court found for Tenant on these claims, and Landlord doesn't appeal those rulings.

Tenant took possession on September 1 and that he had the carpets cleaned in September after Tenant complained about the cat-urine smell. Landlord also testified that he offered to have the house cleaned again, but Tenant "refused." Tr. p. 19. Finally, Landlord testified that after Tenant moved out in October, he tried to rent the house but couldn't until March. He asked the court to order Tenant to pay rent from October to February (five months) plus utilities.

[9] Tenant testified she didn't sign the written lease because of the condition of the house and that she and Landlord had a "verbal agreement" that she would "rent his house month to month." *Id.* at 73. Tenant also testified about the amount of money she spent due to the condition of the house and claimed she wasn't responsible for **any** rent.

[10] Thereafter, the trial court issued an order finding that there was a written lease for the eleven-month period specified in the lease even though Tenant did not sign it. The court then found **both parties** in breach of the lease. First, the court found that Landlord was "in breach by failing to deliver exclusive possession to the Defendant and by failing to deliver the unit in a fit and sanitary condition." Appellant's App. Vol. II p. 9. Second, the court found that Tenant was "in breach by failing to pay rent after the month of September." *Id.* In addition, the court found that Landlord violated the security-deposit statute and that Tenant was entitled to the return of her security deposit plus a portion of her attorney's fees. The court calculated damages as follows:

4. The damages to [Landlord] for [Tenant's] breach are found to be $6,500 for five months of unpaid rent and $582.50 in utility costs for a total of $7,082.50 in damages.

5. The damages to [Tenant] for [Landlord's] breach include $2,543.74 for money spent related to the condition of the property as well as an abatement of one month's rent related to the time she needed to remedy the condition of the property for a total of $3,843.74.

\* \* \* \*

10. The Court awards reasonable attorney's fees of $1,900 to [Tenant].

11. Balancing all of these claims the Court enters judgment in favor of [Landlord] and against [Tenant] in the amount of $38.76 (said amount includes crediting the security deposit and attorney's fee award against sums owed to [Landlord]). The Court directs [Tenant] to reimburse [Landlord] for an additional $59.37 for ½ of the court costs in this case.

*Id.* at 9-10.

Tenant appeals, and Landlord cross-appeals.

# Discussion and Decision

Small-claims actions involve informal trials with the sole objective of dispensing speedy justice between the parties according to the rules of substantive law. *Lae v. Householder*, 789 N.E.2d 481, 483 (Ind. 2003). We will reverse only upon clear error. *Kalwitz v. Kalwitz*, 934 N.E.2d 741, 748 (Ind. Ct. App. 2010), *trans. denied*.

We will neither reweigh the evidence nor assess witness credibility and will consider only the evidence most favorable to the judgment. *Id.* But this deferential standard does not apply to the substantive rules of law, which are reviewed de novo just as they are in appeals from a court of general jurisdiction. *Lae*, 789 N.E.2d at 483.

## I. Enforceability of Written Lease

[13] Tenant contends the eleven-month written lease is unenforceable because she did not sign it. Instead, she claims that she and Landlord had an oral lease to rent the house month to month.

[14] Generally, a written lease should be signed by both the lessor and the lessee. 18 Indiana Law Encyclopedia, *Landlord & Tenant* § 16 (Mar. 2023 update). However, if a lease has been signed by the lessor and accepted and acted upon by the lessee, it may be binding on both parties even though it is not signed by the lessee. *Id.*; *see also* 2 C.J.S. *Landlord & Tenant* § 363 (Apr. 2023 update) (providing that a lease not signed by a lessee "may be effective where the lessee enters into the use and occupation of the premises and acts under the lease as by paying rent" (footnotes omitted)); 49 Am. Jur. 2d *Landlord and Tenant* § 28 (May 2023 update) ("Where a lessor drafts a lease and presents it to the lessee for signing, the lease is valid and binding upon the lessee's acceptance, even if the lessor fails to sign."); *Int'l Creative Mgmt., Inc. v. D & R Ent. Co.*, 670 N.E.2d 1305, 1313 (Ind. Ct. App. 1996) ("Generally, the validity of a contract is not dependent upon the signature of the parties, unless such is made a condition of

the agreement. However, some form of assent to the terms of the contract is necessary." (citation omitted)), *reh'g denied*.

[15] Here, Landlord sent a written lease to Tenant. She said she would sign it once she had her computer, but she never did. Nevertheless, Tenant acted according to the terms of the written lease. She paid the $1,300 security deposit, took possession of the house on September 1, paid September's rent, and eventually moved in. Because Tenant accepted the written lease, it is enforceable even though she didn't sign it.

[16] Citing Indiana Code section 32-31-1-2, Tenant claims there was a general tenancy that operated month to month. According to Section 32-31-1-2, "A general tenancy in which the premises are occupied by the express or constructive consent of the landlord is considered to be a tenancy from month to month." "General tenancies are 'not fixed and made certain in point of duration by the agreement of the parties.'" *Rueth v. Quinn*, 659 N.E.2d 684, 688 (Ind. Ct. App. 1996) (quoting *Brown's Adm'rs v. Bragg*, 22 Ind. 122, 123 (1864)), *trans. denied*. But here, there is not a general tenancy because the written lease sets forth a fixed eleven-month rental period. We agree with the trial court that there is a written lease for eleven months.

## II. Breach of Lease

[17] Tenant next contends that even if she accepted the written lease, the trial court erred in ordering her to pay rent and utilities from October to February (until the house was relet in March). Tenant claims that she isn't responsible for any

rent or utilities because Landlord was the first party to breach the lease when he failed to deliver the house in a fit and sanitary condition.

[18]	In support of her argument that Landlord's breach relieved her of the obligation to pay rent and utilities, Tenant cites Indiana Code section 32-31-8-5, which requires a landlord to "[d]eliver the rental premises to a tenant in compliance with the rental agreement, and in a safe, clean, and habitable condition" and "[p]rovide and maintain [certain] items in a rental premises in good and safe working condition."[2] Although landlords have these duties, tenants must notify them of any problems and give them a "reasonable amount of time to make repairs or provide a remedy." Ind. Code § 32-31-8-6(b)(2).

[19]	Here, Landlord and Tenant gave conflicting stories at trial. The trial court resolved these conflicts and found that Landlord failed to "deliver" the house in a fit and sanitary condition and thus Tenant was not responsible for September's rent. However, the court went on to find that Tenant was responsible for rent starting the next month. Thus, the court necessarily determined that the initial problems had been sufficiently remedied to the point that the house was fit and sanitary starting in October. Otherwise, it wouldn't have found Tenant to be in breach for not paying rent starting in October.

---

[2] As Landlord highlights, Tenant's attorney clarified at trial that Tenant "did not bring a claim for any warranty of habitability or anything else, she's only seeking damages here for the security deposit statute, nothing else plead or at issue." Tr. p. 108.

[20] Tenant moved in on September 29, signaling her acceptance of the house in its improved condition. When Landlord asked for October's rent, Tenant said the house was still not habitable but pointed to old problems, i.e., garbage, rotten food, and cat urine. Ex. Vol. III p. 49. Landlord offered to have the house cleaned again, but Tenant said no. The next day, Tenant emailed Landlord that she was terminating the lease "[d]ue to the inhabitable [sic] conditions" in the house and specifically pointed to mold in various areas of the house.[3] *Id.* at 74. Landlord said he would find an expert to address any mold, but again Tenant didn't accept Landlord's offer.

[21] Considering the evidence most favorable to the trial court's determination that Tenant was responsible for rent starting in October, Tenant did not give Landlord a reasonable opportunity to fix any problems that she identified after moving in on September 29. Thus, Tenant's decision to terminate the lease does not mean that she is excused from paying rent and utilities from October to February.[4]

---

[3] At trial, Tenant testified that she bought a do-it-yourself mold test kit in early October, that she took swabs from several places in the house, and that mold grew in the petri dishes. She introduced into evidence photographs of the petri dishes. On cross-examination, Tenant acknowledged that the test kit didn't identify the type of mold and that she didn't send in the test kit for analysis. Landlord acknowledged that there was a small amount of mold in the house, like on food in the refrigerator and a bathroom cabinet. However, he said that he had someone inspect the house for mold, but the inspector didn't find any. The trial court found that Tenant did not prove "a mold issue with the property for which [Landlord] is liable." Appellant's App. Vol. II p. 9. This is a factual determination that we will not reweigh.

[4] In her reply brief, Tenant discusses the concept of "constructive eviction." Appellant's Reply Br. p. 6. Tenant has waived any argument under this concept for not raising it until her reply brief. *See Monroe Guar. Ins. Co. v. Magwerks Corp.*, 829 N.E.2d 968, 977 (Ind. 2005).

## III. Security-Deposit Statute

[22] The trial court found that Landlord "failed to timely prepare and serve a deposit damage statement upon the [Tenant]" under Indiana's security-deposit statute, Indiana Code chapter 32-31-3. As a result, the court found that Tenant was entitled to a return of her $1,300 security deposit plus $1,900 in attorney's fees. Landlord cross-appeals, arguing he timely returned the statement to Tenant.[5]

[23] Indiana Code section 32-31-3-12 addresses a landlord's obligation to provide a security-deposit statement to a tenant:

> (a) Upon termination of a rental agreement, a landlord shall return to the tenant the security deposit minus any amount applied to:
>
> > (1) the payment of accrued rent;
> >
> > (2) the amount of damages that the landlord has suffered or will reasonably suffer by reason of the tenant's noncompliance with law or the rental agreement; and
> >
> > (3) unpaid utility or sewer charges that the tenant is obligated to pay under the rental agreement;
>
> all as itemized by the landlord with the amount due in a written notice that is delivered to the tenant **not more than forty-five**

---

[5] In her opening brief, Tenant says attorney's fees are available under another statute, Indiana Code section 32-31-8-6. Appellant's Br. p. 20. Because Tenant did not rely on this statute in the trial court, we do not address it. *See Pearman v. Stewart Title Guar. Co.*, 108 N.E.3d 342, 350 (Ind. Ct. App. 2018), *reh'g denied*, *trans. denied*.

**(45) days after termination of the rental agreement and delivery of possession**. . . .

(b) If a landlord fails to comply with subsection (a), a tenant may recover all of the security deposit due the tenant and reasonable attorney's fees.

(Emphasis added); *see also* I.C. §§ 32-31-3-13, -14. Our Supreme Court has explained that "the landlord's obligation begins to run 'after termination of the rental agreement and delivery of possession.'" *Lae*, 789 N.E.2d at 484 (quoting I.C. § 32-31-3-12(a)). "Or, to put it more precisely, termination of the rental agreement occurs after surrender by the tenant and acceptance of surrender by the landlord." *Id.* "[A] surrender cannot be effected by the actions of only one party; therefore, a surrender may not be forced upon a landlord by the unilateral actions of the tenant." *Turner v. Knowles*, 208 N.E.3d 614, 617 (Ind. Ct. App. 2023); *see also* 52 C.J.S. *Landlord & Tenant* § 217 (May 2023 update). The landlord must make "a decisive, unequivocal act" that manifests acceptance of the tenant's surrender. *Eppl v. DiGiacomo*, 946 N.E.2d 646, 652 (Ind. Ct. App. 2011).

[24] Landlord claims the forty-five-day period began to run on March 21, 2022, when he relet the property and therefore the statement he sent to Tenant on April 15 was timely.[6] We agree. As Landlord highlights, this Court has held

---

[6] Tenant argues that Landlord has waived this argument because he conceded below that the clock started to run in January 2022 when he received Tenant's forwarding address. Our review of the record shows that

that "where a tenant vacates the premises and the lease agreement terminates at a later date, the 45 day period does not commence until the date that the lease terminates" or the landlord relets the property. *Figg v. Bryan Rental Inc.*, 646 N.E.2d 69, 73 (Ind. Ct. App. 1995), *reh'g denied*, *trans. denied*; *Mileusnich v. Novogroder Co.*, 643 N.E.2d 937, 941 (Ind. Ct. App. 1994), *reh'g denied*. Here, although the lease didn't terminate until July 26, 2022, Landlord relet the house on March 21. Accordingly, the forty-five-day period began to run on March 21, making the April 15 statement timely.

[25] Tenant does not dispute this case law. Instead, she argues that the lease terminated on October 8 when Landlord allegedly "chang[ed] the locks." Appellant's Reply Br. p. 14. At trial, Tenant testified that when she went to the house on October 8 to get some belongings, "the door code was changed." Tr. p. 86. Tenant added that Landlord had told her a cleaning person was coming that day. Tenant's testimony that the door code was changed does not establish "a decisive, unequivocal act" that manifested Landlord's acceptance of Tenant's surrender, especially considering the record shows that Tenant could reenter the house and returned the keys on October 20. Because Landlord's

---

Landlord's attorney was discussing the date that Landlord received Tenant's forwarding address and did not concede that the clock started to run then. As Landlord explains, the date that Landlord received Tenant's forwarding address does not start the running of the clock; rather, the termination of the rental agreement and delivery of possession start the running of the clock.

statement was timely, Tenant is not entitled to attorney's fees under the security-deposit statute.[7] The trial court erred in this regard.

## IV. Damages

[26] Given the above, the damages are as follows. Tenant is responsible for $6,500 in rent and $582.50 in utilities from October to February, for a total of $7,082.50. However, Tenant is entitled to a credit of $1,300 against her unpaid rent from her security deposit.[8] In addition, because of the work that Tenant performed in September to remedy the condition of the house, she is entitled to a credit of $1,300 for September's rent (which she had already paid) and $2,543.74 for the money she spent due to the condition of the house, for a total of $3,843.74.[9] Tenant thus owes Landlord $1,938.76 plus $59.37 in court costs.

[27] Affirmed in part and reversed in part.

Foley, J., concurs.

Tavitas, J., concurs in part and dissents in part, with separate opinion.

---

[7] Given this determination, we need not address Tenant's argument that the trial court should have awarded more than $1,900 in attorney's fees.

[8] Although Landlord claimed that Tenant damaged the house, the trial court did not find Tenant liable for any damages. As a result, there are no deductions from Tenant's $1,300 security deposit.

[9] In his cross-appeal, Landlord says the trial court erred in awarding $2,543.74 in damages to Tenant because her attorney said at trial that Tenant was only seeking damages under the security-deposit statute. *See supra* note 2. Because Tenant spent that money to remedy Landlord's failure to deliver the house in a fit and sanitary condition, we agree with the trial court that Tenant is entitled to these damages.

**Tavitas, Judge, concurring in part, dissenting in part.**

[28] I respectfully concur in part and dissent in part. I agree that the parties had a written lease and that Landlord's security deposit statement was timely. I part ways, however, with the majority's conclusion that Tenant failed to give Landlord a reasonable opportunity to fix the issues with the residence. Rather, I conclude that the Landlord breached his statutory obligation to provide a habitable residence and that Tenant gave Landlord more than enough time to resolve the issues. Accordingly, I conclude that Tenant is not responsible for paying the rent and utilities for the duration of the lease.

[29] When the lease began on September 1, 2021, Landlord gave possession of the property to Tenant in a deplorable condition. Landlord, who previously resided in the residence, left garbage, carpet and furniture soaked with cat urine, rotten food, a dried frog in the master bedroom closet, a clogged kitchen sink, and absolute filth. Tenant repeatedly brought the cat urine smell and the other issues to Landlord's attention for over a month via a messaging app. *See* Ex. Vol. III p. 26 (complaining on September 3 of the "strong smell of cat pee" and asking Landlord to "call someone to clean it"); *id.* at 34 (discussing that owner's friend was in the house and Tenant would move in after he left); *id.* at 38 (complaining on September 14 after the carpets were cleaned that the sofa still smelled of cat urine); *id.* at 40 (complaining on September 14 of the rotten food in the kitchen, small flying insects, and a clogged sink); *id.* at 40 (complaining on September 21 that Tenant had rented a carpet cleaning machine because "cat urine was still in the room"); *id.* at 43 (complaining on September 23 of the

dead, dried frog in the closet); *id.* at 46 (complaining on September 23 that the dishwasher was smelly and that someone left the outside hose on and flooded the yard); *id.* at 48 (complaining on September 23 again of the clogged sink). Tenant attempted to clean the residence herself but could not remove the strong smell of cat urine. Although Landlord had the carpets cleaned, the issue was not resolved.

[30] Despite the continued issues, Tenant had to move in at the end of September because the lease on her prior residence was expiring, and Tenant had nowhere else to live. By the beginning of October, Tenant and her husband, who is allergic to cats, were having health issues. They also brought an alleged mold issue to the Landlord's attention. Every time the air conditioning turned on, a "strong smell" was present, and Tenant and her husband started "sneezing and coughing." Ex. Vol. III p. 53. In fact, on October 5, Tenant had to be treated in the emergency room for breathing issues. At that point, Tenant had to live in a hotel and sought to terminate the lease.

[31] The trial court here found that Landlord failed "to deliver the unit in a fit and sanitary condition." Appellant's App. Vol. II p. 9. Indiana Code Section 32-31-8-5 requires a landlord to deliver the rental premises in a "safe, clean, and habitable condition." Landlord failed to do so and breached the lease.

[32] The majority, moreover, concludes that Tenant failed to give Landlord a "reasonable amount of time to make repairs or provide a remedy" pursuant to Indiana Code Section 32-31-8-6. I disagree and conclude that Landlord was

provided with more than enough time to make the repairs. *See, e.g., Husainy v. Granite Mgmt., LLC*, 132 N.E.3d 486, 497 (Ind. Ct. App. 2019) (holding that "a jury could reasonably find that Granite did not remedy the lack of hot running water within a reasonable amount of time" where tenants were without hot water for more than fourteen days).

[33]     Despite Landlord's breach, the trial court also found that Tenant breached by failing to pay rent after September. "A party first guilty of a material breach of contract may not maintain an action against or recover damages from the other party to the contract." *Ream v. Yankee Park Homeowner's Ass'n, Inc.*, 915 N.E.2d 536, 547 (Ind. Ct. App. 2009). Tenant, thus, should not be on the hook for failing to pay rent after she vacated the property due to its deplorable conditions. Additionally, Tenant was entitled to damages pursuant to Indiana Code Section 32-31-8-6(d), including:

> (1) Recovery of the following:
>
>> (A) Actual damages and consequential damages.
>>
>> (B) Attorney's fees and court costs.
>
> (2) Injunctive relief.
>
> (3) Any other remedy appropriate under the circumstances.

[34]     Landlord had a duty to deliver the property to Tenant in a clean and habitable condition, which Landlord failed to do. For a month, Tenant raised issues

regarding the condition of the property. Landlord made minimal attempts to resolve the issues until Tenant sought to terminate the lease. I am concerned that the majority's opinion encourages landlords to simply ignore their responsibilities to provide habitable rental properties. A tenant should not be required to wait weeks for a landlord to remedy unsanitary conditions. I conclude that Landlord, not Tenant, breached the Lease and that Tenant gave Landlord more than enough time to remedy the conditions of the property. Accordingly, I conclude that Tenant was entitled to appropriate damages under Indiana Code Section 32-31-8-6.